## MORSE ET AL. *v.* REPUBLICAN PARTY OF VIRGINIA ET AL.

No. 94–203.   Argued October 2, 1995—Decided March 27, 1996

188

STEVENS, J., announced the judgment of the Court and delivered an opinion, in which GINSBURG, J., joined. BREYER, J., filed an opinion concurring in the judgment, in which O'CONNOR and SOUTER, JJ., joined, *post*, p. 235. SCALIA, J., filed a dissenting opinion, in which THOMAS, J., joined, *post*, p. 241. KENNEDY, J., filed a dissenting opinion, in which REHNQUIST, C. J., joined, *post*, p. 247. THOMAS, J., filed a dissenting opinion, in which REHNQUIST, C. J., and SCALIA, J., joined, and in which KENNEDY, J., joined as to Part II, *post*, p. 253.

*Pamela S. Karlan* argued the cause for appellants. With her on the briefs were *George A. Rutherglen, Eben Moglen,* and *Daniel R. Ortiz.*

*Deputy Solicitor General Bender* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Days, Assistant Attorney General Patrick, Richard H. Seamon,* and *Steven H. Rosenbaum.*

*E. Duncan Getchell, Jr.,* argued the cause for appellees. With him on the brief were *J. Robert Brame III, Patrick M. McSweeney, Donald W. Lemons,* and *Robert L. Hodges.*\*

---

\*Briefs of *amici curiae* urging reversal were filed for the Lawyers' Committee for Civil Rights under Law et al. by *Donald B. Verrilli, Jr., Michael A. Cooper, Herbert J. Hansell, Norman Redlich, Barbara R. Arnwine, Thomas J. Henderson, Brenda Wright,* and *Laughlin McDonald;*

JUSTICE STEVENS announced the judgment of the Court and delivered an opinion, in which JUSTICE GINSBURG joins.

In 1994, all registered voters in Virginia who were willing to declare their intent to support the Republican Party's nominees for public office at the next election could participate in the nomination of the Party's candidate for the office of United States Senator if they paid either a $35 or $45 registration fee. Appellants contend that the imposition of that fee as a condition precedent to participation in the candidate selection process was a poll tax prohibited by the Voting Rights Act of 1965. The questions we must decide are whether § 5 of the Act required preclearance of the Party's decision to exact the fee and whether appellants were permitted to challenge it as a poll tax prohibited by § 10.

I

On December 16, 1993, the Republican Party of Virginia (Party) issued a call for a state convention to be held on June 3, 1994, to nominate the Republican candidate for United States Senator. The call invited all registered voters in Virginia to participate in local mass meetings, canvasses, or conventions to be conducted by officials of the Party. Any voter could be certified as a delegate to the state convention by a local political committee upon payment of a registration fee of $35 or $45 depending on the date of certification. Over 14,000 voters paid the fee and took part in the convention.

In response to the call, appellants Bartholomew, Enderson, and Morse sought to become delegates to the convention.

and for the National Association for the Advancement of Colored People by *Ronald D. Maines, Dennis Courtland Hayes,* and *Willie Abrams.*

*James S. Gilmore III,* Attorney General, *David E. Anderson,* Chief Deputy Attorney General, *John Paul Woodley, Jr.,* and *William H. Hurd,* Deputy Attorneys General, and *Maureen Riley Matsen,* Assistant Attorney General, filed a brief for the Commonwealth of Virginia as *amicus curiae* urging affirmance.

As a registered voter in Virginia willing to declare his or her intent to support the Party's nominee, each was eligible to participate upon payment of the registration fee. Bartholomew and Enderson refused to pay the fee and did not become delegates; Morse paid the fee with funds advanced by supporters of the eventual nominee.

On May 2, 1994, appellants filed a complaint in the United States District Court for the Western District of Virginia alleging that the imposition of the registration fee violated §§ 5 and 10 of the Voting Rights Act, 79 Stat. 439, 442, as amended, 42 U. S. C. §§ 1973c[1] and 1973h, as well as the Equal Protection Clause of the Fourteenth Amendment[2] and

---

[1] As originally enacted, § 5 provided:

"SEC. 5. Whenever a State or political subdivision with respect to which the prohibitions set forth in section 4(a) are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964, such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure: *Provided*, That such qualification, prerequisite, standard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, except that neither the Attorney General's failure to object nor a declaratory judgment entered under this section shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure. Any action under this section shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of title 28 of the United States Code and any appeal shall lie to the Supreme Court." 79 Stat. 437.

[2] "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U. S. Const., Amdt. 14.

the Twenty-fourth Amendment[3] to the Constitution. They sought an injunction preventing the Party from imposing the fee and ordering it to return the fee paid by Morse. As §§ 5 and 10 require, a three-judge District Court was convened to consider the statutory claims. See *Morse* v. *Oliver North for U. S. Senate Comm., Inc.*, 853 F. Supp. 212 (WD Va. 1994). That court remanded the two constitutional claims to a single-judge District Court,[4] and, after expedited briefing and argument, granted the Party's motion to dismiss the § 5 and § 10 claims.

After noting "a general rule" that political parties are subject to § 5 to the extent that they are empowered to conduct primary elections, the court gave two reasons for concluding that the rule did not apply to the selection of delegates to a state nominating convention. First, it read a regulation promulgated by the Attorney General as disavowing § 5 coverage of political party activities other than the conduct of primary elections. Second, it relied on our summary affirmance of the District Court's holding in *Williams* v. *Democratic Party of Georgia*, Civ. Action No. 16286 (ND Ga., Apr. 6, 1972), that § 5 does not cover a party's decision to change its method of selecting delegates to a national convention. See 409 U. S. 809 (1972). Its dismissal of the § 10 claim rested on its view that only the Attorney General has authority to enforce that section of the Act. 853 F. Supp., at 215–217.

---

[3] "SECTION 1. The right of citizens of the United States to vote in any primary or other election for President or Vice President, for electors for President or Vice President, or for Senator or Representative in Congress, shall not be denied or abridged by the United States or any State by reason of failure to pay any poll tax or other tax.

"SECTION 2. The Congress shall have power to enforce this article by appropriate legislation." U. S. Const., Amdt. 24.

[4] A separate statutory claim alleging that the loan to appellant Morse violated § 11(c) of the Act, 42 U. S. C. § 1973i(c), was also remanded to the single-judge District Court. Neither that claim nor either of the constitutional claims is before us.

We noted probable jurisdiction, 513 U. S. 1125 (1995), and now reverse.

## II

In the Voting Rights Act of 1965, Congress enacted a complex scheme of remedies for racial discrimination in voting that were to be applied in areas where such discrimination had been most flagrant. Section 4 of the Act sets forth the formula for identifying the jurisdictions in which such discrimination had occurred, see *South Carolina* v. *Katzenbach,* 383 U. S. 301, 317–318 (1966), and § 5 prescribes the most stringent of those remedies. It prohibits the enactment or enforcement by any covered jurisdiction of voting qualifications or procedures that differ from those in effect on November 1, 1964, or two later dates, unless they have been precleared by the Attorney General or approved by the United States District Court for the District of Columbia. See *Allen* v. *State Bd. of Elections,* 393 U. S. 544, 548–550 (1969).[5] Virginia is one of the seven States to which the § 4 coverage formula was found applicable on August 7, 1965.[6] The entire Commonwealth has been subject to the preclearance obligation of § 5 ever since.

It is undisputed that the Party's practice of charging a registration fee as a prerequisite to participation in the process of selecting a candidate for United States Senator was

---

[5] In order to obtain preclearance, the covered jurisdiction must demonstrate that its new procedure "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or [membership in a language minority group]," 42 U. S. C. § 1973c. The fact that such a showing could have been made, but was not, will not excuse the failure to follow the statutory preclearance procedure. "Failure to obtain either judicial or administrative preclearance 'renders the change unenforceable.'" *Clark* v. *Roemer,* 500 U. S. 646, 652 (1991) (quoting *Hathorn* v. *Lovorn,* 457 U. S. 255, 269 (1982)).

[6] 30 Fed. Reg. 9897 (1965). The others were Alabama, Alaska, Georgia, Louisiana, Mississippi, and South Carolina. *Ibid.* In addition, portions of North Carolina, Arizona, Hawaii, and Idaho were designated then or shortly thereafter. See 30 Fed. Reg. 14505 (1965).

not in effect on November 1, 1964.  It is also undisputed that if the candidate had been selected in a primary election, the Party could not have enforced a voting qualification or procedure different from those in effect on November 1, 1964, without first preclearing it under §5.  Finally, we understand the Party to agree that if the registration fee had been mandated by state law, or by a state election official, preclearance would have been required.

What is in dispute is whether the coverage of §5 encompasses the Party's voting qualifications and procedures when its nominees are chosen at a convention.  In answering that question, we first note that the District Court's decision is not supported either by the Attorney General's regulation or by the narrow holding in the *Williams* case.  We then explain why coverage is mandated by our consistent construction of the text and history of the Act.  Finally, we discuss the §10 private cause of action issue.

## III

The Party does not question the validity of the Attorney General's regulation.  That regulation unambiguously provides that when a political party makes a change affecting voting, §5 requires preclearance if two conditions are satisfied: The change must relate to "a public electoral function of the party" and the party must be "acting under authority explicitly or implicitly granted by a covered jurisdiction."[7]

---

[7] The regulation, which was adopted in 1981, provides:

"Political parties.  Certain activities of political parties are subject to the preclearance requirement of section 5.  A change affecting voting effected by a political party is subject to the preclearance requirement: (a) If the change relates to a public electoral function of the party and (b) if the party is acting under authority explicitly or implicitly granted by a covered jurisdiction or political subunit subject to the preclearance requirement of section 5.  For example, changes with respect to the recruitment of party members, the conduct of political campaigns, and the drafting of party platforms are not subject to the preclearance require-

The Party does not deny that the delegate fee is a change that relates to a public electoral function of the Party. It argues, instead, that the regulation did not apply when it selected its nominee for United States Senator at a convention because it was not "acting under authority" granted by Virginia. We disagree. The District Court erred in its application of the regulation, because the Party exercised delegated state power when it certified its nominee for automatic placement on Virginia's general election ballot.

Virginia law creates two separate tracks for access to the ballot, depending on the affiliation of the candidate. An independent candidate for a statewide office must comply with several requirements. The candidate must file a declaration of candidacy with the State Board of Elections. He or she must also file a petition signed by a predetermined number of qualified voters. For elections to the United States Senate, that number is equal to one-half of one percent of the registered voters in the Commonwealth, with at least 200 signatures from each of the 11 congressional districts. Va. Code Ann. § 24.2–506 (1993). In 1994, the required number of signatures was 14,871.[8]

By contrast, the election code provides that the nominees of the two major political parties[9] shall automatically appear

---

ment. Changes with respect to the conduct of primary elections at which party nominees, delegates to party conventions, or party officials are chosen are subject to the preclearance requirement of section 5. Where appropriate the term 'jurisdiction' (but not 'covered jurisdiction') includes political parties." 28 CFR § 51.7 (1995).

[8] Virginia had 2,974,149 registered voters on January 1, 1994. See State Bd. of Elections, Commonwealth of Virginia, Number of Precincts and Registered Voters as of January 1, 1994, p. 4 (rev. Jan. 10, 1994). One-half of one percent of that figure is 14,871.

[9] Virginia law defines the term "political party" to include an organization of Virginia citizens "which, at either of the two preceding statewide general elections, received at least ten percent of the total vote cast for any statewide office filled in that election." Va. Code Ann. § 24.2–101

on the general election ballot, without the need to declare their candidacy or to demonstrate their support with a nominating petition. § 24.2–511. Party nominees are listed sequentially on the ballot before independent candidates, all of whom are grouped together in a separate row or column or spaced apart from the former.[10] §§ 24.2–613, 24.2–640. Virginia law authorizes the two parties to determine for themselves how they will select their nominees—by primary, by nominating convention, or by some other method. § 24.2–509(A).[11] The Republican Party has taken advantage

---

(1993). The Democratic Party of Virginia and the Republican Party of Virginia are the only organizations that satisfy that definition.

The definition has not been set in stone, however. Before 1991, the term "political party" included only parties that polled 10 percent of the vote at the *last* preceding statewide election. The Democratic Party, however, did not field a candidate for the 1990 Senate race, and thus would have lost its automatic ballot access for the next election. See 29 Council of State Governments, Book of the States 260 (1992–1993 ed.). Rather than allow that outcome, the Virginia Legislature amended the definition to qualify parties that polled the requisite number of votes at either of the *two* preceding elections and provided that the amendment would apply retroactively. See 1991 Va. Acts, ch. 12, § 1(7).

[10] Virginia law also allows the major political parties to substitute a new nominee should the chosen nominee die, withdraw, or have his or her nomination set aside. In that circumstance, other parties and independent candidates are also permitted to make nominations, but the triggering event occurs only when a party nominee cannot run. The statute thus ensures that the major parties will always have a candidate on the ballot. See Va. Code Ann. §§ 24.2–539, 24.2–540 (1993).

[11] In some circumstances, a primary election is required unless the incumbent officeholder from that party consents to a different method of nomination. Va. Code Ann. § 24.2–509(B) (1993). In its brief, the Party suggested that this one exception to plenary party control over the method of nomination is unconstitutional. See Brief for Appellees 31. While it appeared that the Party might bring suit before the 1996 election to try to have the provision struck down, see Whitley, Republicans Wrestle with Primary Issue, Richmond Times-Dispatch, Oct. 25, 1995, p. B1, it relented after the Attorney General of Virginia determined that the law was probably valid. See Va. Op. Atty. Gen. (Nov. 22, 1995). In any event, because the incumbent United States Senator was a Democrat in 1994, the Party

of these options in past elections. Its nominee has sometimes been selected by the Party's State Central Committee, sometimes by statewide convention, and sometimes by primary election. Whatever method is chosen, state law requires the Commonwealth to place the name of the nominee on the general election ballot.[12]

In this dual regime, the parties "ac[t] under authority" of Virginia when they decide who will appear on the general election ballot. 28 CFR § 51.7 (1995). It is uncontested that Virginia has sole authority to set the qualifications for ballot access. Pursuant to that authority, the Commonwealth has prescribed stringent criteria for access with which nearly all independent candidates and political organizations must comply. But it reserves two places on its ballot—indeed, the top two positions[13]—for the major parties to fill with their nominees, however chosen. Those parties are effectively granted the power to enact their own qualifications for placement of candidates on the ballot, which the Commonwealth ratifies by adopting their nominees. By holding conventions, for example, the Party does not need to

---

was authorized to follow any method it chose, so long as it named its candidate within the time period prescribed by the statute.

[12] The Secretary of the Party is required to certify the name of the nominee to the State Board of Elections. If certification is not timely, however, the board will declare the chosen candidate to be the nominee and treat his or her name as if certified. Va. Code Ann. § 24.2–511 (1993).

[13] Research has shown that placement at the top of a ballot often confers an advantage to candidates so positioned. The classic study of the phenomenon is H. Bain & D. Hecock, Ballot Position and Voter's Choice: The Arrangement of Names on the Ballot and its Effect on the Voter (1957). See also Note, California Ballot Position Statutes: An Unconstitutional Advantage to Incumbents, 45 S. Cal. L. Rev. 365 (1972) (listing other studies); Note, Constitutional Problems with Statutes Regulating Ballot Position, 23 Tulsa L. J. 123 (1987). Some studies have suggested that the effect of favorable placement varies by type of election, visibility of the race, and even the use of voting machines. See id., at 127. While the research is not conclusive, it is reasonable to assume that candidates would prefer positions at the top of the ballot if given a choice.

assemble thousands of signatures on a petition for its nominee. In some years, as few as 550 nominators have selected the Party's candidate for United States Senate.[14] Even in 1994, when the Party convention had its largest attendance to date, fewer nominators were present than would have been necessary to meet the petition requirement.[15] In any event, state law permits the Party to allow as many or as few delegates as it sees fit to choose the Party nominee.

The Party is thus delegated the power to determine part of the field of candidates from which the voters must choose. Correspondingly, when Virginia incorporates the Party's selection, it "endorses, adopts and enforces" the delegate qualifications set by the Party for the right to choose that nominee. *Smith* v. *Allwright*, 321 U. S. 649, 664 (1944). The major parties have no inherent right to decide who may appear on the ballot. That is a privilege conferred by Virginia law, not natural law. If the Party chooses to avail itself of this delegated power over the electoral process, it necessarily becomes subject to the regulation.[16]

---

[14] App. 24 (affidavit of David S. Johnson, Exec. Dir. of Republican Party of Virginia ¶ 12).

[15] According to the Party, 14,614 voters attended the 1994 convention. *Ibid.* A total of 14,871 signatures were required to qualify as an independent candidate. See n. 8, *supra.*

[16] The Party argues that automatic ballot access is merely a "practical accommodation to political reality" because the major parties have shown, through their performance in previous elections, significant levels of voter support. Brief for Appellees 32. According to the Party, the Party nominee need not demonstrate personal support because he or she is credited with the Party's showing. *Id.,* at 33 (citing Weisburd, Candidate-Making and the Constitution: Constitutional Restraints on and Protections of Party Nominating Methods, 57 S. Cal. L. Rev. 213, 242 (1984)).

Such "crediting" does not answer the question why the Party nominee should receive automatic ballot access. The fact that the Party has polled well in previous elections does not logically entail any conclusion about the success of its present candidate—especially when that nominee is chosen at a convention attended by limited numbers of Party members, rather than a primary. Furthermore, ballot access for all other candidates is

In concluding that the regulation applies to the Party, we are guided by the reasoning of *Smith* v. *Allwright,* decided more than half a century ago. There, Texas gave automatic ballot access to the nominee of any party that polled a certain number of votes at the preceding general election, and required independent candidates to file nominating petitions. *Id.,* at 653, n. 6, 663. We explained that "recognition of the place of the primary in the electoral scheme," rather than the degree of state control over it, made clear that "state delegation to a party of the power to fix the qualifications of primary elections is delegation of a state function that may make the party's action the action of the State." *Id.,* at 660. The only difference here is that Virginia has not required its political parties to conduct primary elections to nominate their candidates. But the right to choose the method of nomination makes the delegation of authority in this case more expansive, not less, for the Party is granted even greater power over the selection of its nominees. See generally L. Tribe, American Constitutional Law § 13–24, p. 1121, and n. 3 (2d ed. 1988); Rotunda, Constitutional and Statutory Restrictions on Political Parties in the Wake of *Cousins* v. *Wigoda,* 53 Texas L. Rev. 935, 953–954 (1975);

---

predicated on a showing of individual electability. The Commonwealth certainly may choose to recognize the Party's selection of a nominee, but such recognition is not mandated by any right of the Party to demand placement on the ballot. Contrary to appellees, cases such as *Williams* v. *Rhodes,* 393 U. S. 23 (1968), *Jenness* v. *Fortson,* 403 U. S. 431 (1971), and *American Party of Tex.* v. *White,* 415 U. S. 767 (1974), establish only that political parties with at least a modicum of public support must be provided a reasonable method of ballot access. They do not establish that they are entitled to choose the method *itself.*

According to JUSTICE THOMAS, the Party merely "takes advantage of favorable state law" when it certifies its nominee for automatic placement on the ballot. *Post,* at 274. On that theory, the requirements of 28 CFR § 51.7 (1995) would not be met even if Virginia let only the two major parties place their candidates on the ballot, and no one else. For the same reasons we give below, see *infra,* at 220–221, it is implausible to think the regulation was meant to apply only in one-party States.

Developments in the Law—Elections, 88 Harv. L. Rev. 1111, 1159–1163 (1975). By the logic of *Smith*, therefore, the Party acted under authority of the Commonwealth.[17]

It is true that the example set forth in the Attorney General's regulation describes changes in the conduct of primary elections. That example, however, does not purport to define the outer limits of the coverage of § 5. Moreover, both in its brief *amicus curiae* supporting appellants in this case and in its prior implementation of the regulation, the Department of Justice has interpreted it as applying to changes affecting voting at a party convention.[18] We are satisfied

---

[17] JUSTICE THOMAS argues that our decision in *Smith* v. *Allwright*, 321 U. S. 649 (1944), depended on the State's regulation of the Party's activities. *Post*, at 268. While it is true that political parties in *Smith* were subject to extensive regulation, nothing in our decision turned on that factor. Only nine years before *Smith*, the Court had surveyed the same statutory regime in *Grovey* v. *Townsend*, 295 U. S. 45, 50 (1935), and concluded that primary elections were private voluntary activity. What changed was not the extent of state regulation, but the Court's understanding, based on its intervening decision in *United States* v. *Classic*, 313 U. S. 299 (1941), that primaries were "a part of the machinery for choosing officials." 321 U. S., at 664. On that basis, the Court overruled *Grovey*, even though the objectionable practice there of excluding blacks from membership in the party was undertaken by a private, unregulated entity.

The irrelevance of state regulation was confirmed in two cases decided after *Smith*. Subsequent to *Smith*, South Carolina repealed all of its laws regulating political primaries. The Democratic primary was thereafter conducted under rules prescribed by the Democratic Party alone, which included rules restricting the primary to white persons. The Fourth Circuit struck down those practices, reasoning that "[s]tate law relating to the general election gives effect to what is done in the primary and makes it just as much a part of the election machinery of the state by which the people choose their officers *as if it were regulated by law,* as formerly." *Rice* v. *Elmore*, 165 F. 2d 387, 390–391 (1947) (emphasis added); accord, *Baskin* v. *Brown*, 174 F. 2d 391 (1949). The principal opinion in *Terry* v. *Adams*, 345 U. S. 461 (1953), declared that these cases were "in accord with the commands of the Fifteenth Amendment and the laws passed pursuant to it." *Id.*, at 466 (opinion of Black, J.).

[18] See Brief for United States as *Amicus Curiae* 11–13. Since 1981, when the regulation was promulgated, there have been nearly 2,000 preclearance submissions involving more than 16,000 proposed changes by

that the Department's interpretation of its own regulation is correct. See *Stinson* v. *United States,* 508 U. S. 36, 45 (1993); *Bowles* v. *Seminole Rock & Sand Co.,* 325 U. S. 410, 414 (1945). Accordingly, we conclude that the regulation required preclearance of the Party's delegate filing fee.

The decision in *Williams* v. *Democratic Party of Georgia,* upon which the District Court relied in dismissing this complaint, is not to the contrary. The fact that Virginia statutes grant the nominee of the Party a position on the general election ballot graphically distinguishes the two cases. *Wil-*

---

political parties in covered jurisdictions. See letter from Drew S. Days III, Solicitor General, to William K. Suter, Clerk of the Supreme Court, dated Oct. 4, 1995 (lodged with Clerk of this Court). Of particular note, on April 12, 1982, the Attorney General precleared changes in the delegate selection plan adopted by the Democratic Party of Virginia for its senatorial nominating convention. See Brief for United States as *Amicus Curiae* 12, n. 7; letter from Wm. Bradford Reynolds, Assistant Attorney General, Civil Rights Div., to Russel Rosen, Executive Director, Democratic Party of Va., dated Apr. 12, 1982 (lodged with Clerk of this Court).

Political parties submitted changes in their rules for preclearance, and the Department of Justice interposed objections to those changes, long before 1981. For example: the Sumter County, Alabama, Democratic Executive Committee submitted changes in 1974, and the Democratic Party of New York City submitted changes in 1975. See Extension of the Voting Rights Act: Hearings before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 97th Cong., 1st Sess., pt. 3, pp. 2246, 2265 (1981) (app. to letter from James P. Turner, Acting Ass't Attorney General, to Rep. Edwards dated Apr. 9, 1981). Parties from New York, North Carolina, and Alabama submitted changes in 1972. See D. Hunter, Federal Review of Voting Changes 69, n. 30 (1974), reprinted in Hearings before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 94th Cong., 1st Sess., 1541 (1975). In *MacGuire* v. *Amos,* 343 F. Supp. 119, 121 (MD Ala. 1972), a three-judge court held that rules promulgated by the Alabama Democratic and Republican Parties governing election of national delegates required preclearance, despite the fact that the rules were not passed by "the State's legislature or by a political subdivision of the State." As a result of this decision, the Democratic Party of Alabama sought judicial preclearance under § 5. See *Vance* v. *United States,* Civ. Action No. 1529–72 (DDC Nov. 30, 1972), cited in Hunter, Federal Review of Voting Changes, at 69, n. 30.

*liams* did not concern the selection of nominees for state elective office, but rather a political party's compliance with a rule promulgated by the Democratic National Party governing the selection of delegates to its national convention. According to the District Court's interpretation of Georgia law, the State exercised no control over, and played no part in, the state Party's selection of delegates to the Democratic National Convention.[19] Because the Commonwealth delegated no authority to the Party to choose the delegates, the Party did not act under the authority, implicit or explicit, of the Commonwealth.

If anything, the logic of *Williams* supports application of the preclearance requirement. The District Court stated that it was "convinced that voting rights connected with the delegate election process are the type of rights Congress intended to safeguard" by passage of the Act. Civ. Action No. 16286, at 4. It declined to require the party to preclear changes in its nominating methods only because there were no administrative procedures for submission of such changes at the time of the decision. *Id.*, at 5. Since then, however, the Attorney General has clarified that "an appropriate official of the political party" may submit party rules affecting

---

[19] "The State has no connection with the delegate selection process or State Party's rules and regulations other than allowing the rules and regulations to be filed under Ga. Code Ann. § 34-902. The purpose of such filing is merely to provide a place for public inspection of the State Party's rules and regulations." *Williams* v. *Democratic Party of Georgia*, Civ. Action No. 16286 (ND Ga., Apr. 6, 1972), pp. 4-5. In their motion to affirm in that case, the appellees noted that the Secretary of State of Georgia was obligated to approve a political party's rules applicable to the selection of candidates for public office by convention but had no authority to review the rules and regulations promulgated by the National Democratic Party governing the selection of delegates to its national convention. Under the Attorney General's regulation that is now in effect, preclearance of the National Democratic Party's rule change would not have been required if the District Court's interpretation of Georgia law was correct. Our summary affirmance no doubt accepted that court's view of the relevant state law. Cf. *Bishop* v. *Wood*, 426 U. S. 341, 345-346 (1976).

voting for preclearance, 28 CFR §51.23(b) (1993), thereby eliminating this one practical obstacle. Other lower courts have subsequently required preclearance of internal party rules, even when those rules do not relate to the conduct of primary elections.[20] Indeed, if the rationale of *Williams* were still valid, §5 would not cover party primaries either, for the party (by hypothesis) would likewise have no means of preclearing changes. But it is firmly established— and the Party does not dispute—that changes affecting primaries carried out by political parties must be precleared.[21]

The District Court was therefore incorrect to base its decision on either the Attorney General's regulation or on our summary affirmance in *Williams*. The Party's activities fall directly within the scope of the regulation. We next conclude, based on the language and structure of the Act, and the historical background which informed the Congress that enacted it, that §5 of its own force covers changes in electoral practices such as the Party's imposition of a filing fee for delegates to its convention.

## IV

Section 5 of the Act requires preclearance of changes in "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting." Section

---

[20] See, *e. g., Fortune* v. *Kings County Democratic Comm.*, 598 F. Supp. 761, 764 (EDNY 1984) (requiring preclearance of change in voting membership of county party executive committee, because those members performed a "public electoral function" in filling vacancies in nominations for state office).

[21] We also note that a summary affirmance by this Court is a "rather slender reed" on which to rest future decisions. *Anderson* v. *Celebrezze*, 460 U. S. 780, 784–785, n. 5 (1983). "A summary disposition affirms only the judgment of the court below, and no more may be read into our action than was essential to sustain that judgment." *Ibid.* Either of the two grounds discussed above—the State's noninvolvement or the absence of suitable administrative procedures for submission—would have sufficed for our affirmance.

14 defines the terms "vote" or "voting" to include "all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to, registration, listing pursuant to this subchapter, or other action required by law prerequisite to voting, casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast with respect to candidates for public or party office and propositions for which votes are received in an election." 42 U. S. C. § 1973*l*(c)(1).

Although a narrow reading of the text of the Voting Rights Act might have confined the coverage of §5 to changes in election practices that limit individual voters' access to the ballot in jurisdictions having authority to register voters, see *United States* v. *Sheffield Bd. of Comm'rs*, 435 U. S. 110, 140–150 (1978) (STEVENS, J., dissenting); *Holder* v. *Hall*, 512 U. S. 874, 892, 914 (1994) (THOMAS, J., concurring in judgment), the Court has squarely rejected that construction. Shortly after the statute was passed, the Court thoroughly reviewed its legislative history and found that Congress intended §5 to have "the broadest possible scope" reaching "any state enactment which altered the election law of a covered State in even a minor way." *Allen* v. *State Bd. of Elections*, 393 U. S., at 566–567. Similarly, in *Sheffield*, the Court concluded that "the language of the Act does not require such a crippling interpretation, but rather is susceptible of a reading that will fully implement the congressional objectives." 435 U. S., at 117. We expressly held that "§5, like the constitutional provisions it is designed to implement, applies to all entities having power over any aspect of the electoral process within designated jurisdictions, not only to counties or to whatever units of state government perform the function of registering voters." *Id.*, at 118. More recently we noted that §5 is "expansive within its sphere of operation" and "comprehends all changes to rules governing voting." *Presley* v. *Etowah County Comm'n*, 502 U. S. 491, 501 (1992).

We have consistently construed the Act to require pre-clearance of any change in procedures or practices that may bear on the "effectiveness" of a vote cast in "any primary, special, or general election." 42 U. S. C. § 1973*l*(c)(1). Rules concerning candidacy requirements and qualifications, we have held, fall into this category because of their potential to "undermine the effectiveness of voters who wish to elect [particular] candidates." *Allen,* 393 U. S., at 570; see also *Dougherty County Bd. of Ed.* v. *White,* 439 U. S. 32, 40 (1978). Changes in the composition of the electorate that votes for a particular office—that is, situations that raise the specter of vote dilution—also belong to this class because they could "nullify [voters'] ability to elect the candidate of their choice just as would prohibiting some of them from voting." 393 U. S., at 569. This nexus between the changed practice and its impact on voting in the general election has been a recurring theme in our cases interpreting the Act. See *Chisom* v. *Roemer,* 501 U. S. 380, 397 (1991) ("Any abridgment of the opportunity of members of a protected class to participate in the political process inevitably impairs their ability to influence the outcome of an election"). In its reenactments and extensions of the Act, moreover, Congress has endorsed these broad constructions of § 5. See, *e. g.,* S. Rep. No. 97–417, pp. 6–7, and n. 8 (1982).

A filing fee for party delegates operates in precisely the same fashion as these covered practices. By limiting the opportunity for voters to participate in the Party's convention, the fee undercuts their influence on the field of candidates whose names will appear on the ballot, and thus weakens the "effectiveness" of their votes cast in the general election itself. As an elementary fact about our Nation's political system, the significance of the nominating convention to the outcome in the general election was recognized as long ago as Justice Pitney's concurrence in *Newberry* v. *United States,* 256 U. S. 232 (1921). Joined by Justices Brandeis and Clarke, he wrote: "As a practical matter, the ultimate choice

of the mass of voters is predetermined when the nominations [by the major political parties] have been made." *Id.,* at 286 (opinion concurring in part). See also *United States* v. *Classic,* 313 U. S. 299, 319 (1941) (endorsing the *Newberry* concurrence). Just like a primary, a convention narrows the field of candidates from a potentially unwieldy number to the serious few who have a realistic chance to win the election. We have held, in fact, that the State's compelling interest in winnowing down the candidates justifies substantial restrictions on access to the ballot. *American Party of Tex.* v. *White,* 415 U. S. 767, 782, and n. 14 (1974). Virginia, no doubt, would justify its own ballot access rules—including those for the major parties—on just this basis.[22]

We have previously recognized that § 5 extends to changes affecting nomination processes other than the primary. In *Whitley* v. *Williams,* one of the companion cases decided with *Allen,* this Court affirmed § 5 coverage of a scheme that placed new burdens on voters who wished to nominate independent candidates by petition. The Court was unconcerned that the changes did not directly relate to the conduct of a primary, because they had an effect on the general election. See *Allen,* 393 U. S., at 570. One of those changes was a requirement that each nominator sign the petition personally and state his or her polling precinct and county. See *id.,* at 551. Like the filing fee in this case, that condition made it more difficult for voters to participate in the nomina-

---

[22] Virginia created its first signature requirement for self-nominated candidates in 1936. See Va. Code Ann., Tit. 6, § 154 (1936) (requiring petition signed by 250 qualified voters of the Commonwealth). Although the Commonwealth maintains limited legislative history records, contemporary news accounts reported that the provision was designed to "discourage cranks and persons who for personal glorification take advantage of the very liberal terms of the election code." New Qualification, The Richmond News Leader, Mar. 6, 1936, p. 8. Then as now, political parties were exempt from the signature requirement.

tion process, and therefore properly fell within § 5's scope. A fee of $45 to cast a vote for the Party nominee is, if anything, a more onerous burden than a mere obligation to include certain public information about oneself next to one's name on a nominating petition. In dissent, Justice Harlan agreed that "the nominating petition is the functional equivalent of the political primary." *Id.*, at 592 (opinion concurring in part and dissenting in part).

Delegate qualifications are in fact more closely tied to the voting process than practices that may cause vote dilution, whose coverage under § 5 we have repeatedly upheld. Virginia, like most States, has effectively divided its election into two stages, the first consisting of the selection of party candidates and the second being the general election itself. See *United States* v. *Classic*, 313 U. S., at 316. Exclusion from the earlier stage, as two appellants in this case experienced, does not merely curtail their voting power, but abridges their right to vote itself. To the excluded voter who cannot cast a vote for his or her candidate, it is all the same whether the party conducts its nomination by a primary or by a convention open to all party members except those kept out by the filing fee. Each is an "integral part of the election machinery." *Id.*, at 318.

The reference to "party office" in § 14, which defines the terms "vote" and "voting" as they appear throughout the Act, reinforces this construction of § 5. Section 14 specifically recognizes that the selection of persons for "party office" is one type of action that may determine the effectiveness of a vote in the general election. Delegates to a party convention are party officers. See H. R. Rep. No. 439, 89th Cong., 1st Sess., 32 (1965) ("Thus, for example, an election of delegates to a State party convention would be covered by the act"). The phrase "votes cast with respect to candidates for public or party office" in § 14 is broad enough to encompass a variety of methods of voting beyond a formal elec-

tion.[23] Cf. *Classic*, 313 U. S., at 318. The Party itself recognizes this point, for both in its brief to this Court and in its Plan of Organization, it repeatedly characterizes its own method of selecting these delegates as an "election."[24]

The legislative history of § 14 supports this interpretation. Representative Bingham proposed addition of the term "party office" to the language of the section for the express purpose of extending coverage of the Act to the nominating activities of political parties. See Hearings on H. R. 6400 before Subcommittee No. 5 of the House Committee on the Judiciary, 89th Cong., 1st Sess., 456–457 (1965) (proposing coverage of "political party meetings, councils, conventions, and referendums which lead to endorsement or selection of candidates who will run in primary or general elections"). Congressional concern that the Act reach the selection of party delegates was not merely speculative. On the floor of the House, Representative Bingham expressed the importance of preventing a reprise of the fiasco of the previous year, 1964, "when the regular Democratic delegation from Mississippi to the Democratic National Convention was chosen through a series of Party caucuses and conventions from which Negroes were excluded." 111 Cong. Rec. 16273 (1965); see also Hearings on H. R. 6400, 89th Cong., 1st Sess.,

---

[23] Quoting this very language, we have observed that candidates are nominated, not elected. *Chisom* v. *Roemer*, 501 U. S. 380, 400 (1991). It is not anomalous, therefore, to hold that § 5 applies regardless of the means of nomination.

[24] See Brief for Appellees 2; App. 32 (Republican Party Plan, Art. II, ¶ 22) (defining "Party Canvass" as "a method of electing . . . delegates to Conventions"); *id.*, at 52 (Plan, Art. VIII, § A, ¶ 3) (referring to "any election by a Mass Meeting, Party Canvass, or Convention"); *id.*, at 56 (Plan, Art. VIII, § H, ¶ 4); *id.*, at 23 (affidavit of David S. Johnson, Exec. Dir. of Republican Party of Virginia, ¶¶ 5, 8). The call for the state convention itself, to which appellants responded, stated: "The delegates and alternates shall be elected in county and city Mass Meetings, Conventions or Party Canvasses that shall be held between March 1, 1994 and April 1, 1994." *Id.*, at 62.

at 456 ("The events of 1964 demonstrate the need" to expand § 14). As he later explained, the solution that was reached to this problem was "to add to the definition of the word 'vote' in section 14(c)(1)." 111 Cong. Rec. 16273. The Party's delegates to its 1994 convention were chosen through precisely the same methods Representative Bingham described: mass meetings, conventions, and canvasses. Exempting the Party from the scope of § 14 would thus defeat the purpose for which the House and eventually Congress as a whole adopted Representative Bingham's amendment.

The text of § 2 also makes apparent the Act's intended coverage of nonprimary nomination methods. Section 2, which bans any "voting qualification or prerequisite" that discriminates on account of race or color, considers a violation to have occurred if "*the political processes leading to nomination or election* in the State or political subdivision are not equally open to participation by members of [groups protected by the Act] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U. S. C. § 1973(b) (1988 ed.) (emphasis added). Under the broad sweep of this language, exclusion from a nominating convention would qualify as a violation. Section 2 "adopts the functional view of 'political process'" and applies to "any phase of the electoral process." S. Rep. No. 97–417, at 30, and n. 120.

If such practices and procedures fall within the scope of § 2, they must also be subject to § 5. In recent cases, some Members of this Court have questioned whether § 2 is as broad as § 5, see *Chisom* v. *Roemer*, 501 U. S., at 416–417 (SCALIA, J., dissenting); *Holder* v. *Hall*, 512 U. S., at 882–885 (opinion of KENNEDY, J.); *id.*, at 930 (THOMAS, J., concurring in judgment), but there has never been any doubt about the converse—that changes in practices within covered jurisdictions that would be potentially objectionable under § 2 are also covered under § 5. The purpose of preclearance is to

prevent all attempts to implement discriminatory voting practices that change the status quo. If § 5 were narrower than § 2, then a covered jurisdiction would not need to preclear changes in voting practices known to be illegal. "It is unlikely that Congress intended such an anomalous result." *Chisom,* 501 U. S., at 402.[25]

A fair reading of the text of § 5 unquestionably supports the conclusion that by imposing its filing fee the Party sought to administer a "voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1968." 42 U. S. C. § 1973c (1988 ed.).

V

Consideration of the history that led to passage of the Act confirms our construction of § 5. The preamble to the stat-

---

[25] In fact, it did not. The 1981 House Report states that "whether a discriminatory practice or procedure is of recent origin affects only the mechanism that triggers relief, i. e., litigation or preclearance." H. R. Rep. No. 97–227, p. 28. That statement indicates that the substantive standards for § 2 and § 5 violations are the same, so long as the challenged practice represents a change from 1965 conditions, as the filing fee did here. Even more explicitly, the 1982 Senate Report states that "a section 5 objection also follow[s] if a new voting procedure itself so discriminates as to violate section 2." S. Rep. No. 97–417, p. 12, n. 31. The Report refers to voting procedures that dilute minority voting strength. See *id.,* at 10. We have recognized that measures undertaken by both "'[s]tate legislatures *and political party committees*'" have had just such dilutive effects, through devices that included "'switching to at-large elections where Negro voting strength is concentrated in particular election districts, facilitating the consolidation of predominantly Negro and predominantly white counties, and redrawing the lines of districts to divide concentrations of Negro voting strength.'" *Perkins* v. *Matthews,* 400 U. S. 379, 389 (1971) (quoting Hearings on Voting Rights Act Extension before Subcommittee No. 5 of the House Committee on the Judiciary, 91st Cong., 1st Sess., 17 (1969) (remarks of Mr. Glickstein)) (emphasis added). See also n. 27, *infra.* Contrary to JUSTICE THOMAS, therefore, Congress has already "harmonize[d]" §§ 2 and 5, see *post,* at 282; it is he who seeks to sunder them.

ute expressly identifies the "fifteenth amendment" as the constitutional provision the Act was designed to implement.[26] Our cases dealing with the applicability of that Amendment to the selection of party candidates in States that engaged in the sort of voting discrimination that § 5 was designed to remedy are therefore directly relevant. See *McCain* v. *Lybrand,* 465 U. S. 236, 246 (1984) (interpreting Act "in light of its prophylactic purpose and the historical experience which it reflects"); *Dougherty County Bd. of Ed.* v. *White,* 439 U. S., at 37 (seeking "guidance from the history and purpose of the Act"). In a series of decisions known as the White Primary Cases, this Court applied the Fifteenth and Fourteenth Amendments to strike down a succession of measures by authorities in Texas to exclude minority voters from their nomination processes. These cases demonstrate that electoral practices implemented by political parties have the potential to "den[y] or abridg[e] the right to vote on account of race or color," which § 5 prohibits. 42 U. S. C. § 1973c (1988 ed.).

*Nixon* v. *Herndon,* 273 U. S. 536 (1927), involved the validity of a Texas statute enacted in 1923 that flatly provided " 'in no event shall a negro be eligible to participate in a Democratic party primary election held in the State of Texas,' " *id.,* at 540. It took only a paragraph for Justice Holmes to conclude that it was "unnecessary to consider the Fifteenth Amendment, because it seems to us hard to imagine a more direct and obvious infringement of the Fourteenth." *Id.,* at 540–541. Promptly after the announcement of that decision, the Texas Legislature responded to what it regarded as an emergency by replacing the invalid provision with a substitute that authorized the executive committee of every political party to determine "in its own way" who shall be "qualified to vote or otherwise participate in such political party." *Nixon* v. *Condon,* 286 U. S. 73, 82

---

[26] "To enforce the fifteenth amendment to the Constitution of the United States, and for other purposes." 79 Stat. 437.

(1932). The State Executive Committee of the Democratic Party adopted a rule that only "white democrats" could participate in the party's primary elections. Pursuant to that rule, Mr. Nixon was again refused a primary ballot and again persuaded this Court that the authors of the discriminatory rule should be "classified as representatives of the State to such an extent and in such a sense that the great restraints of the Constitution set limits to their action." *Id.*, at 89.

The decision in *Nixon* v. *Condon* relied on the fact that a state statute authorized the Party's Executive Committee to determine the qualifications of voters. Thereafter the Party implemented the same discriminatory policy without statutory authorization by adopting a resolution at a state convention restricting party membership to "white persons." When it first confronted the issue, the Court held that implementation of that rule was not state action. *Grovey* v. *Townsend*, 295 U. S. 45 (1935). A few years later, however, *Grovey* was overruled and the Court decided that the resolution adopted by the party's state convention constituted state action violative of the Fifteenth Amendment even though it was not expressly authorized by statute. *Smith* v. *Allwright*, 321 U. S. 649 (1944). We wrote:

> "The United States is a constitutional democracy. Its organic law grants to all citizens a right to participate in the choice of elected officials without restriction by any State because of race. This grant to the people of the opportunity for choice is not to be nullified by a State through casting its electoral process in a form which permits a private organization to practice racial discrimination in the election. Constitutional rights would be of little value if they could be thus indirectly denied. *Lane* v. *Wilson*, 307 U. S. 268, 275 [(1939)]." *Id.*, at 664.

The same policy of excluding all nonwhite voters from the electoral process was thereafter implemented in certain

Texas counties by a private organization known as the Jaybird Democratic Association. It conducted a so-called "Jaybird primary" at which white voters selected candidates who thereafter ran in and nearly always won the Democratic Party's primary and the general election. Although the Jaybirds had no official status, received no state funds, and conducted a purely private election, the Court readily concluded that this voluntary association's exclusion of black voters from its primaries on racial grounds was prohibited by the Fifteenth Amendment. *Terry* v. *Adams,* 345 U. S. 461 (1953). Citing our earlier cases, Justice Clark tersely noted that an "old pattern in new guise is revealed by the record." *Id.,* at 480 (concurring opinion).

Congress passed the Voting Rights Act of 1964 because it concluded that case-by-case enforcement of the Fifteenth Amendment, as exemplified by the history of the white primary in Texas, had proved ineffective to stop discriminatory voting practices in certain areas of the country on account of the intransigence of officials who "resorted to the extraordinary stratagem of contriving new rules of various kinds for the sole purpose of perpetuating voting discrimination in the face of adverse federal court decrees." *South Carolina* v. *Katzenbach,* 383 U. S., at 335 (citing H. R. Rep. No. 439, at 10–11; S. Rep. No. 162, 89th Cong., 1st Sess., pt. 3, pp. 8, 12 (1965)). The preclearance system of § 5 was designed to end this evasion once and for all. By prohibiting officials in covered jurisdictions from implementing any change in voting practices without prior approval from the District Court for the District of Columbia or the Attorney General, it sought to "shift the advantage of time and inertia from the perpetrators of the evil to its victims." *South Carolina* v. *Katzenbach,* 383 U. S., at 328.[27]

---

[27] Congress was plainly aware of the power of political parties to carry out discriminatory electoral practices as a supplement to or a substitute for voting discrimination by government officials. Of course, the White Primary Cases supplied the primary historical examples of such prac-

The distinction between a primary and a nominating convention is just another variation in electoral practices that § 5 was intended to cover. The imposition of a $45 fee on

tices. See H. R. Rep. No. 439, 89th Cong., 1st Sess., 8 (1965). In addition, during the 1970 extension of the Act, Congress heard testimony from the Director of the United States Civil Rights Commission wherein he reiterated the influence political parties continued to exercise over the electoral process in jurisdictions designated under the Act. He testified that "[s]tate legislatures and political party committees in Alabama and Mississippi have adopted laws or rules since the passage of the act which have had the purpose or effect of diluting the votes of newly enfranchised Negro voters." Hearings on Voting Rights Act Extension before Subcommittee No. 5 of the House Committee on the Judiciary, 91st Cong., 1st Sess., 17 (1969) (remarks of Mr. Glickstein), quoted in *Perkins* v. *Matthews*, 400 U. S., at 389. As examples, he introduced evidence that in 1968 the Mississippi Democratic Party persisted in its "pattern of exclusion of and discrimination against Negroes at precinct meetings, county conventions and the State convention," Hearings on Voting Rights Act Extension, 91st Cong., 1st Sess., at 18–19; that other officials "withheld information from black party members about party precinct meetings and conventions or have prevented them from participating fully," *id.*, at 18, 43; that the Alabama Democratic Party raised candidate filing fees for some of its primaries tenfold after blacks began voting in large numbers, *id.*, at 18, 27; and that various party executive committees refused to count votes by blacks who were not on the registration books, even if they were listed by the Federal Examiner, *id.*, at 46, engaged in discriminatory purges of black voters, *id.*, at 48, and misled black candidates about the requirements for running in primary elections or did not notify them of their failure to qualify until after deadlines had passed, *id.*, at 46–47.

In his testimony, Director Glickstein summarized the more extensive findings about discriminatory electoral practices carried out by the established political parties that were set forth in a report prepared by the United States Commission on Civil Rights pursuant to congressional directive. See *id.*, at 17–18. It concluded that, three years after passage of the Act,

"in some areas there has been little or no progress in the entry and participation by Negroes in political party affairs—the key to meaningful participation in the electoral process. Some of the practices found are reminiscent of those which existed at an earlier time during Reconstruction when fear of 'Negro government' gave rise to intimidation and a number of election contrivances which finally led to disenfranchisement of the Negro citi-

the privilege of participating in the selection of the Party's nominee for the United States Senate is equally a practice or procedure relating to voting whether the selection is made by primary election or by a "convention" in which every voter willing to pay the fee is eligible to cast a vote. A primary election would not cease to be a practice relating to voting if the Party imposed such a high fee that only 14,000 voters cast ballots; nor should a "convention" performing the same electoral function as a primary avoid coverage because fewer voters participate in the process than normally vote in a primary. As was true in *Sheffield,* "the District Court's interpretation of the Act ... makes § 5 coverage depend upon a factor completely irrelevant to the Act's purposes, and thereby permits precisely the kind of circumvention of congressional policy that § 5 was designed to prevent." 435 U. S., at 117. It would undermine the Act to permit " '[s]uch a variation in the result from so slight a change in form.' " *Terry* v. *Adams,* 345 U. S., at 465, n. 1 (quoting *Smith* v. *All-wright,* 321 U. S., at 661).

Section 5 coverage of nominating conventions follows directly from our decision in *Terry.* Although called a "primary," the Jaybird election was the equivalent of the Party's nominating convention, for it did not involve the State's electoral apparatus in even the slightest way—neither to supply election officials, nor ballots, nor polling places. See 345 U. S., at 471 (opinion of Frankfurter, J.). In fact, the Jaybirds went far beyond the Party in immunizing their nomination process from the State's control. The Jaybird nominee did not receive any form of automatic ballot access. He filed individually as a candidate in the Democratic primary, paid the filing fee, and complied with all requirements to which other candidates were subject. *Id.,* at 486–487 (Minton, J., dissenting). No mention of the nominee's Jaybird affiliation was ever made, either on the primary or on the general elec-

---

zen." U. S. Commission on Civil Rights, Political Participation 178 (May 1968).

tion ballot. Those elections, moreover, were open to any candidate who was able to meet the filing requirements, and to black as well as white voters. If the Jaybirds' nominating process violated the Fifteenth Amendment because black voters were not permitted to participate, despite the entirely voluntary nature of the Jaybird association, then § 5—which requires preclearance of all practices with the potential to discriminate—must cover the Party's exclusion of voters from its convention.[28]

Appellees nevertheless assert that *Terry*, like the other White Primary Cases, has no bearing on the proper interpretation of the Voting Rights Act. They offer three reasons for that contention: first, that their convention did not operate in a racially discriminatory manner, Brief for Appellees 37; second, that the 89th Congress did not intend to legislate to the "outer limit" of the Fifteenth Amendment, *ibid.*; and third, that present-day Virginia is not a one-party Commonwealth, unlike Texas after Reconstruction, *id.*, at 36. None of these reasons is persuasive.

First, while it is true that the case before us today does not involve any charge of racial discrimination in voting, the decision whether discrimination has occurred or was intended to occur, as we have explained on many occasions, is for the Attorney General or the District Court for the District of Columbia to make in the first instance. *NAACP* v. *Hampton County Election Comm'n*, 470 U. S. 166, 181 (1985); *McCain* v. *Lybrand*, 465 U. S., at 250; *Dougherty County Bd. of Ed.* v. *White*, 439 U. S., at 42; *Georgia* v. *United States*, 411 U. S. 526, 534 (1973); *Perkins* v. *Matthews*,

---

[28] The analogy is even closer, for the Jaybirds originally performed their nominations in mass meetings. See 345 U. S., at 470 (opinion of Frankfurter, J.); *id.*, at 480 (Clark, J., concurring). Nothing in any of the opinions suggests—and it would be perverse to suppose—that the Jaybirds' nominating activities only became unconstitutional when they switched to balloting methods.

400 U. S. 379, 383–385 (1971); *Allen* v. *State Bd. of Elections,* 393 U. S., at 570. The critical question for us, as for the District Court below, is whether "the challenged alteration has the *potential* for discrimination." *Hampton County Election Comm'n,* 470 U. S., at 181 (emphasis in original). It is not contested that the Party's filing fee had that potential.[29]

The second argument misconceives the purpose of the pre-clearance system and the nature of the Act as a whole. Again, the very preamble of the Act states that its purpose is to enforce the Fifteenth Amendment. 79 Stat. 437. Section 5 "is a means of assuring in advance the absence of all electoral illegality, not only that which violates the Voting Rights Act but *that which violates the Constitution as well.*" *Chisom,* 501 U. S., at 416 (SCALIA, J., dissenting) (emphasis added). It is beyond question, therefore, that the Act encompassed the discriminatory practices struck down in *Terry* and *Smith,* which this Court had found violative of the same constitutional guarantees. Not only were they the leading cases securing the right to vote against racial discrimination at the time of enactment, but Congress passed the Act to facilitate the enforcement effort they embodied. It strains credulity to suppose that despite Congress' professed impatience with the "case-by-case" method of enforcing voting rights, it did not mean to cover the cases that capped the struggle to end the white primary.[30]

---

[29] JUSTICE THOMAS' claim that there has been no purposeful evasion of the Constitution, see *post,* at 269–270, is therefore irrelevant.

[30] Appellees' theory is particularly unpersuasive in light of the fact that other parts of the Voting Rights Act reach *beyond* the scope of § 1 of the Fifteenth Amendment. For example, the Act created a *per se* ban on literacy tests despite this Court's decision that facially fair tests are not themselves unconstitutional. *Lassiter* v. *Northampton County Bd. of Elections,* 360 U. S. 45 (1959). We upheld this exercise of Congress' power under § 2 of the Amendment without overruling *Lassiter. South Carolina* v. *Katzenbach,* 383 U. S. 301, 334 (1966); see also *City of Rome*

The final argument fares no better. We have expressly rejected the contention that the right to vote depends on the success rate of the candidates one endorses. Voting at the nomination stage is protected regardless of whether it "invariably, sometimes or never determines the ultimate choice of the representative." *United States* v. *Classic*, 313 U. S., at 318. The operative test, we have stated repeatedly, is whether a political party exercises power over the electoral process. See *United States* v. *Sheffield Bd. of Comm'rs*, 435 U. S., at 122 ("§ 5 has to apply to all entities exercising control over the electoral processes within the covered States or subdivisions"); *Dougherty County Bd. of Ed.* v. *White*, 439 U. S., at 44–45 (§ 5 coverage depends only on the "impact of a change on the elective process"); *Terry*, 345 U. S., at 481 ("[A]ny 'part of the machinery for choosing officials' becomes subject to the Constitution's restraints") (quoting *Smith* v. *Allwright*, 321 U. S., at 664). That situation may arise in two-party States just as in one-party States. Indeed, the *Terry* concurrence summarized *Smith* as holding that "the Democratic Party of itself, *and perforce any other political party,* is prohibited by [the Fifteenth] Amendment from conducting a racially discriminatory primary election." *Terry*, 345 U. S., at 481 (Clark, J., concurring) (emphasis added). See also *Moore* v. *Ogilvie*, 394 U. S. 814, 818 (1969) (holding that the use of nomination petitions by *independent candidates* is a procedure that "must pass muster against the charges of discrimination or of abridgment of the right to vote"); *Classic*, 313 U. S., at 318.[31] The contrary position

v. *United States,* 446 U. S. 156, 173–178 (1980). Congress again legislated beyond the reach of the Fifteenth Amendment when it amended § 2 of the Act to reject the "intent test" propounded in *Mobile* v. *Bolden,* 446 U. S. 55 (1980). See S. Rep. No. 97–417, at 39–43.

[31] JUSTICE THOMAS contends that *United States* v. *Classic* is inapplicable because Party nominating conventions are not "'by law made an integral part of the election machinery.'" *Post,* at 270, n. 12. *Moore* v. *Ogilvie,* 394 U. S. 814 (1969), shows that this view is incorrect. The Court in *Moore* held that the use of nominating petitions by independent candidates

would make little sense. On appellees' theory, one political party could not exclude blacks from the selection of its nominee, however it chose that individual, but two parties each independently could.

In any event, the controlling factor for our construction of §5 is Congress' intent. It is apparent from the legislative history that Congress did not mean to limit §5 to political parties whose nominating procedures "foreordained" the results of the general election, see *post*, at 269 (THOMAS, J., dissenting). The impetus behind the addition of the term "party office" to §14 was the exclusion of blacks from the Mississippi delegation to the National Democratic Convention in 1964. See *supra*, at 208–209. The activities of those delegates did not settle the result of the Presidential race; Republican candidates won the general election in 1952 and 1956, and from 1968 until 1992, excluding 1976. Nevertheless, Congress insisted that the selection of those delegates must be open to all voters, black and white.

The imposition by an established political party—that is to say, a party authorized by state law to determine the method of selecting its candidates for elective office and also authorized to have those candidates' names automatically appear atop the general election ballot—of a new prerequisite to voting for the party's nominees is subject to §5's preclearance requirement.

---

was an "'integral part of the election process,'" even though a nominating petition obviously is not a primary, and that procedure plainly was not "merged by law," *post*, at 270, n. 12, into the State's election apparatus. See 394 U. S., at 818 (citing *Classic* and *Smith*); *MacDougall* v. *Green*, 335 U. S. 281, 288 (1948) (Douglas, J., dissenting). See also Hearings on H. R. 6400 before Subcommittee No. 5 of the House Committee on the Judiciary, 89th Cong., 1st Sess., 457 (1965) (statement of Rep. Bingham) ("It is clear that political party meetings, councils, conventions, and referendums which lead to endorsement or selection of candidates who will run in primary or general elections are, in most instances, a vital part of the election process") (citing *Smith* and *Terry*).

## VI

JUSTICE KENNEDY and JUSTICE THOMAS reject our construction of § 5 for a number of reasons, none of which is convincing. They rely primarily on the argument that, under a literal reading of the statutory text, a political party is not a "State or political subdivision" within the meaning of § 5 because it is not a unit of government. See *post*, at 253–276 (THOMAS, J., dissenting); *post*, at 248–250 (KENNEDY, J., dissenting). The radicalism of this position should not be underestimated. It entirely rejects the distinction between primary elections and conventions that is the centerpiece of the Party's argument. On this view, even if a political party flagrantly discriminated in the selection of candidates whose names would appear on the primary election ballot or in the registration of voters in a primary election, it would not fall within the coverage of § 5. Unsurprisingly, neither the District Court nor the Party advanced this extreme argument, for it is plainly at war with the intent of Congress and with our settled interpretation of the Act.[32]

Almost two decades ago we held in *United States* v. *Sheffield Bd. of Comm'rs* that "§ 5, like the constitutional provisions it is designed to implement, applies to *all entities* having power over any aspect of the electoral process within designated jurisdictions." 435 U. S., at 118 (emphasis added). We understood the phrase "State or political subdivision" to have a "territorial reach" that embraced "actions that are not formally those of the State." *Id.*, at 127. The Court even invoked *Terry* to make its point. 435 U. S., at 127. JUSTICE THOMAS' efforts to confine *Sheffield* and our subsequent decision in *Dougherty* do not make sense of those cases. *Dougherty* held that a county school board qualifies

---

[32] The Party makes passing reference to the idea in its brief, but the surrounding argument makes clear that it only challenges application of the regulation to its nominating activities. See Brief for Appellees 30–40. At oral argument, moreover, the Party confirmed that it believed § 5 could encompass the activities of political parties. See Tr. of Oral Arg. 28–30.

as a "State or political subdivision" even though it is clearly neither "one of the 50 constituent States of the Union," *post,* at 254, nor "a political subdivision" of any such State in a literal sense or as that term is defined in the statute itself.[33] Indeed, a major political party has far more power over the electoral process than a school board, which we conceded has "no nominal electoral functions." *Dougherty,* 439 U. S., at 44.

Besides the fact that it contravenes our precedents, this argument fails at the purely textual level. The Voting Rights Act uses the same word as the Fifteenth Amendment—"State"—to define the authorities bound to honor the right to vote. Long before Congress passed the Voting Rights Act, we had repeatedly held that the word "State" in the Fifteenth Amendment encompassed political parties. See *Smith* v. *Allwright; Terry* v. *Adams.* How one can simultaneously concede that "State" reaches political parties under the Fifteenth Amendment, yet argue that it "plainly" excludes all such parties in § 5, is beyond our understanding. Imposing different constructions on the same word is especially perverse in light of the fact that the Act—as it states on its face—was passed to enforce that very Amendment. See *United States* v. *CIO,* 335 U. S. 106, 112 (1948) ("There is no better key to a difficult problem of statutory construction than the law from which the challenged statute emerged"). Speculations about language that might have more clearly reached political parties are beside the point. It would be a mischievous and unwise rule that Congress cannot rely on our construction of constitutional language when it seeks to exercise its enforcement power pursuant to the same provisions.[34]

---

[33] The statute defines "political subdivision" as a unit of government that registers voters. 42 U. S. C. § 1973*l*(c)(2) (1988 ed.).

[34] JUSTICE KENNEDY and JUSTICE THOMAS nevertheless argue that Congress should have borrowed language from 42 U. S. C. § 1983 if it had intended § 5 to cover political parties. To bolster the point, they cite the "Prohibited acts" provision of the Act, § 11(a), which forbids any "per-

222

JUSTICE THOMAS makes two other arguments. First, he contends that we should not defer to the Attorney General's regulation when construing the coverage of § 5. See *post*, at 258. The argument is surprising because our explanation of why § 5 applies to political parties places no reliance on principles of administrative deference. It is nevertheless interesting to note that the regulation has been endorsed by three successive administrations.[35]

---

son acting under color of law" to interfere with the exercise of the right to vote. See 42 U. S. C. § 1973i(a) (1988 ed.). It is quite natural, however, that Congress would draw on § 1983 when it sought to draft provisions that established individual liability for persons who violate civil rights such as the right to vote. Section 1983 was designed "to give a remedy to parties deprived of constitutional rights, privileges and immunities by an official's abuse of his position." *Monroe* v. *Pape*, 365 U. S. 167, 172 (1961). Section 11(a) served exactly the same end, and therefore used similar language.

By contrast, Congress would not have looked to § 1983 to supply language for § 5 for the simple reason that § 1983 does not reach the one type of entity Congress most desired § 5 to cover: the States themselves. See *Will* v. *Michigan Dept. of State Police*, 491 U. S. 58 (1989). JUSTICE THOMAS tries to avoid this problem by proposing a new, disjunctive statutory phrase that is supposedly clearer than the present § 5: "'State or political subdivision or any person acting under color of State law.'" *Post*, at 265 (emphasis deleted). That concatenation of elements, however, appears in no statute ever enacted, so it is unclear why it is preferable to language that had already been construed by this Court. Furthermore, the "person acting under color of state law" locution would be simultaneously too broad and too narrow in that context. Section 5 focuses not on actions that individuals carry out, but on voting practices that organizations enact or implement. Ordinary "persons" do not create and implement voting practices. At the same time, the "plain meaning" of the word "person" does not include political parties. While "person" can be read more broadly, so can "State," as our precedents show. Finally, if "person" reached nonnatural entities, it would become partly redundant with the word "State," which the dissent itself concedes encompasses political units smaller than States. See *Sheffield*; *Dougherty*. In short, it is hardly surprising that Congress opted for the language of the Constitution rather than JUSTICE THOMAS' concocted phrase.

[35] JUSTICE THOMAS is unwilling to accept our representation as to the reasoning underlying our decision; he goes on at great length about our

Second, relying principally on *Jackson* v. *Metropolitan Edison Co.*, 419 U. S. 345 (1974), and *Flagg Bros., Inc.* v. *Brooks*, 436 U. S. 149 (1978), JUSTICE THOMAS argues that a major political party is not a "state actor" unless its nominees are virtually certain to win the general election. See *post*, at 264–276. Thus, the Party would be a state actor if Virginia allowed only its candidates' names to appear on the ballot, but if the privilege of ballot access (or a preferred position) is reserved to two parties, neither is performing a public function when it selects its nominees. Given JUSTICE THOMAS' reliance on cases construing the reach of the Fourteenth Amendment, the argument seems to challenge both the constitutional power of Congress to prohibit discrimination in the Party's selection of its nominees for federal office and our construction of the statute.

To the extent the argument addresses the constitutionality of the Act, it is wholly unconvincing. *Jackson* held that a private utility did not act "under color of any statute . . . of any State" within the meaning of 42 U. S. C. § 1983 when it terminated a customer's electric service. *Flagg Bros.* held that a warehouseman did not violate § 1983 when it sold goods that were entrusted to it for storage. In both cases, this Court concluded that the defendants were not acting under authority explicitly or implicitly delegated by the State when they carried out the challenged actions. In this case, however, as we have already explained, *supra*, at 195–200, the Party acted under the authority conferred by the Virginia election code. It was the Commonwealth of Virginia—indeed, *only* Virginia—that had the exclusive power to reserve one of the two special ballot positions for the

---

treatment of the regulation, claiming that we "displac[e]" § 5 with it, *post*, at 258, n. 4; that we "substitut[e]" it as the "analytical starting point" of the case, *post*, at 262; and that by considering it we somehow prejudge the question presented, *post*, at 263. None of these assertions is accurate. We begin our discussion of the case by analyzing the regulation for the simple reason that the District Court rested its decision on that ground, and the Party argues that the regulation supports its position.

Party.[36]  Moreover, unlike cases such as *Jackson* and *Flagg Bros.*, this is a case in which Congress has exercised the enforcement power expressly conferred to it by § 2 of the Fifteenth Amendment.  That power unquestionably embraces the authority to prohibit a reincarnation of the white primaries, whether they limit the field of viable candidates to just one as in *Terry*, or to just two as would be permissible under JUSTICE THOMAS' construction of the Act.

To the extent the argument addresses the coverage of the Act, it is equally unconvincing.  As we have already explained, the legislative history of the Act makes it perfectly clear that Congress did not intend to limit the application of § 5 to nominating procedures that "foreordained" the results of the general election.  After the statute was enacted, the majority opinions in *Jackson* and *Flagg Bros.* included language that may limit the reach of the constitutional holdings in the White Primary Cases.  Those later opinions, however, shed no light on the intent of the Congress that had already enacted the Voting Rights Act and unambiguously expressed a purpose to have it apply to the candidate selection process.  While JUSTICE THOMAS would narrowly confine the coverage

---

[36] While JUSTICE THOMAS relies heavily on JUSTICE O'CONNOR's dissenting opinion in *Edmonson* v. *Leesville Concrete Co.*, 500 U.S. 614 (1991), he overlooks the fact that the Court's holding in that case makes it clear that state delegation of selection powers to two adversaries instead of just one state actor does not preclude a finding of state action.  The *Edmonson* dissent argued that since peremptory strikes are available to both opposing sides in a lawsuit, the State cannot simultaneously advance each party's use.  The dissent reasoned, therefore, that the State is "neutral" as to their use and not "'responsible'" for it.  *Id.*, at 643.  Virginia, on the other hand, grants automatic ballot access to only two entities, and requires everyone else to comply with more onerous requirements.  As we have shown, Virginia gives a host of special privileges to the major parties, including automatic access, preferential placement, choice of nominating method, and the power to replace disqualified candidates.  See *supra*, at 195–197, and nn. 10–13.  It is perfectly natural, therefore, to hold that Virginia seeks to advance the ends of both the major parties.

of the Act to practices that prevent a voter at a general election from casting a ballot and having it counted, see *post*, at 278 (citing the concurrence in *Holder* v. *Hall*, 512 U. S. 874 (1994)), we have no doubt that Congress intended to prohibit the dominant political parties from engaging in discriminatory practices in primary elections as well as conventions of the character involved in this case.

In his separate dissent, JUSTICE KENNEDY accuses us of adopting a "blanket rule" that all political parties must preclear all of their "internal procedures." See *post*, at 250, 251. That characterization is quite inaccurate. We hold that political parties are covered under § 5 only in certain limited circumstances: here, only insofar as the Party exercises delegated power over the electoral process when it charges a fee for the right to vote for its candidates. It is JUSTICE KENNEDY who proposes the "blanket rule" that political parties are *never* covered under the Act, no matter what functions they perform and no matter what authority the State grants them. As we have explained, on that construction even situations involving blatant discrimination by political parties of the kind not seen since the White Primary Cases would fail to trigger the preclearance requirement.

JUSTICE KENNEDY downplays the significance of this drastic limitation by arguing that voters who face electoral discrimination could sue under the Fifteenth Amendment. But lawsuits are no substitute for the preclearance requirement; if they were, § 5 would be superfluous for governmental units, too. As we have explained, the fundamental purpose of the preclearance system was to "shift the advantage of time and inertia from the perpetrators of the evil to its victims," *South Carolina* v. *Katzenbach*, 383 U. S., at 328, by declaring all changes in voting rules void until they are cleared by the Attorney General or by the District Court for the District of Columbia. JUSTICE KENNEDY's construction would reimpose the very burden § 5 was designed to

relieve—the necessity of relying on "case-by-case litigation" to protect the right to vote. *Ibid.*

JUSTICE KENNEDY argues that this would be a "much different" case if the State "restructured its election laws in order to allow political parties the opportunity to practice unlawful discrimination in the nominating process." *Post,* at 252. On his view, however, without any restructuring at all, the Party could now take advantage of Virginia's present election laws to perform the same discriminatory acts. It is simply inaccurate, moreover, to claim that the State had undertaken such legislative efforts in each of the White Primary Cases. The Jaybirds in *Terry* began discriminating against minority voters as early as 1889, and, as we have explained, they operated entirely outside the framework of Texas' electoral laws. Finally, it is highly counterintuitive to rely on cases such as *Smith* and *Terry* for the proposition that voters affected by discrimination should sue the State rather than the political party that carries it out, for those cases were actions against parties, not the State.

What JUSTICE KENNEDY apparently finds most objectionable in our decision is the idea that political parties must seek preclearance from the Attorney General of the United States, because she is a "political officer," *post,* at 251. Pursuant to § 5, the Attorney General is entrusted with the statutory duty of determining whether submitted changes have the purpose or will have the effect to discriminate. The suggestion implicit in JUSTICE KENNEDY's opinion, that we should avoid our construction of § 5 because the Attorney General might subvert her legal responsibility in order to harass a political party, is quite extraordinary and unsupported by even a shred of evidence. In any event, any political party distrustful of the Attorney General may seek preclearance under § 5 from the District Court for the District of Columbia.

## VII

Appellees advance two practical objections to our interpretation of § 5: that it will create an administrative nightmare for political parties as well as the Department of Justice by requiring preclearance of a multitude of minor changes in party practices; and that it threatens to abridge associational rights protected by the First Amendment. Each of these objections merits a response.

With respect to the first, it is important to emphasize the limitations spelled out in the Attorney General's regulation. To be subject to preclearance a change must be one "affecting voting." Examples of changes that are not covered include "changes with respect to the recruitment of party members, the conduct of political campaigns, and the drafting of party platforms." 28 CFR § 51.7 (1995). The line between changes that are covered and those that are not may be difficult to articulate in the abstract, but given the fact that the regulation has been in effect since 1981 and does not appear to have imposed any unmanageable burdens on covered jurisdictions, it seems likely that the administrative concerns described by the Party are more theoretical than practical.[37] Indeed, past cases in which we were required to construe the Act evoked similar protestations that the ad-

---

[37] This conclusion is buttressed by the fact that in most covered jurisdictions party candidates are selected in primary elections which are admittedly subject to the preclearance requirement. Apparently, Alabama and Virginia are the only two States covered by the Act that authorize the use of conventions to nominate candidates for statewide office. See Council of State Governments, Book of the States 217–218 (1994–1995 ed.).

We also note that States may remove themselves from the special provisions of the Act, such as preclearance, by means of the bailout mechanisms provided in § 4. Several States and political subdivisions initially designated for coverage have successfully availed themselves of these procedures. See, e. g., S. Rep. No. 94–295, p. 35 (1975) (citing bailouts by Alaska; Wake County, North Carolina; Elmore County, Idaho; and Apache, Navajo, and Coconino Counties, Arizona).

vocated construction would prove administratively unworkable. See *Dougherty County Bd. of Ed.* v. *White,* 439 U. S., at 54 (Powell, J., dissenting); *United States* v. *Sheffield Bd. of Comm'rs,* 435 U. S., at 147–148 (STEVENS, J., dissenting). Those fears were not borne out, and we think it no more likely that these will either.

With respect to the second argument, we wholeheartedly agree with appellees that the right of association of members. of a political party "is a basic constitutional freedom" and that "governmental action that may have the effect of curtailing freedom to associate is subject to the closest scrutiny." Brief for Appellees 25 (citing *Buckley* v. *Valeo,* 424 U. S. 1 (1976), and *NAACP* v. *Alabama ex rel. Patterson,* 357 U. S. 449 (1958)). Such scrutiny, however, could not justify a major political party's decision to exclude eligible voters from the candidate selection process because of their race; the Fifteenth Amendment and our cases construing its application to political parties foreclose such a possibility. See *Smith* v. *Allwright,* 321 U. S., at 657 (rejecting argument that Democratic Party of Texas, as a private voluntary association, could exclude black voters from its primary); *Eu* v. *San Francisco County Democratic Central Comm.,* 489 U. S. 214, 232 (1989) (justifying legislative "intervention" in internal party affairs where "necessary to prevent the derogation of the civil rights of party adherents") (citing *Smith*).

Moreover, appellees have not argued that the registration fee at issue in this case—which is challenged because it curtails the freedom of association of eligible voters arguably in conflict with the interests protected by the Twenty-fourth Amendment—is itself protected by the First Amendment. Rather, they have suggested that hypothetical cases unrelated to the facts of this case might implicate First Amendment concerns that would foreclose application of the preclearance requirement. It is sufficient for us now to respond

that we find no constitutional impediment to enforcing § 5 in the case before us.[38]  We leave consideration of hypothetical concerns for another day.[39]

---

[38] We recognize that there is a narrow category of exceptional cases in which litigants "are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick* v. *Oklahoma*, 413 U. S. 601, 612 (1973).  Because a claim of facial overbreadth, if successful, is such "strong medicine," the doctrine "has been employed by the Court sparingly and only as a last resort." *Id.*, at 613.  Specifically, as is the case with § 5 of the Voting Rights Act, "where conduct and not merely speech is involved, we believe that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Id.*, at 615.  The breadth and importance of the legitimate sweep of § 5 have been demonstrated in a long and unbroken line of decisions applying its preclearance requirements to covered jurisdictions.  Even among political parties, it is undisputed that the right of associative freedom would not provide a defense to many practices condemned by § 5.  See *Smith*, 321 U. S., at 657; *Eu*, 489 U. S., at 232.  Cf. *Tashjian* v. *Republican Party of Conn.*, 479 U. S. 208, 237 (1986) (SCALIA, J., dissenting) (the State "may lawfully require that significant elements of the democratic election process be democratic—whether the Party wants that or not").  Presumably that is why appellees have not argued that § 5 is invalid on its face.  Unlike JUSTICE SCALIA, we do not believe that the possibility that some future application of the statute might violate the First Amendment justifies a departure from our "traditional rules governing constitutional adjudication."  413 U. S., at 610.

We also disagree with his assertion that the requirement that the Party preclear a change in practices that imposes a registration fee on voters seeking to participate in the nomination process is a "classic prior restraint."  It imposes no restraint at all on speech.  Given the past history of discrimination that gave rise to the preclearance remedy imposed by § 5, the minimal burden on the right of association implicated in this case is unquestionably justified.

[39] Relying on statements in appellees' brief, rather than anything in the record, JUSTICE THOMAS suggests that the registration fee was intended to avoid the danger that funding the convention with contributions from a few major donors would enable a small group of contributors to exercise

## VIII

The District Court dismissed appellants' claim under § 10 of the Act because that section only authorizes enforcement proceedings brought by the Attorney General and does not expressly mention private actions.[40] While that ruling might have been correct if the Voting Rights Act had been enacted recently, it fails to give effect to our cases holding

---

undue influence over the candidate selection process. See *post*, at 283. The argument is ironic, to say the least, given the evidence that the supporters of the successful candidate for the Party's nomination were willing to pay a delegate's registration fee in return for that delegate's vote. See App. 7–8 (Complaint ¶¶ 21–34).

[40] As originally enacted, § 10 provided, in part:

"SEC. 10.   (a) The Congress finds that the requirement of the payment of a poll tax as a precondition to voting (i) precludes persons of limited means from voting or imposes unreasonable financial hardship upon such persons as a precondition to their exercise of the franchise, (ii) does not bear a reasonable relationship to any legitimate State interest in the conduct of elections, and (iii) in some areas has the purpose or effect of denying persons the right to vote because of race or color.   Upon the basis of these findings, Congress declares that the constitutional right of citizens to vote is denied or abridged in some areas by the requirement of the payment of a poll tax as a precondition to voting.

"(b) In the exercise of the powers of Congress under section 5 of the fourteenth amendment and section 2 of the fifteenth amendment, the Attorney General is authorized and directed to institute forthwith in the name of the United States such actions, including actions against States or political subdivisions, for declaratory judgment or injunctive relief against the enforcement of any requirement of the payment of a poll tax as a precondition to voting, or substitute therefor enacted after November 1, 1964, as will be necessary to implement the declaration of subsection (a) and the purposes of this section.

"(c) The district courts of the United States shall have jurisdiction of such actions which shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of title 28 of the United States Code and any appeal shall lie to the Supreme Court.   It shall be the duty of the judges designated to hear the case to assign the case for hearing at the earliest practicable date, to participate in the hearing and determination thereof, and to cause the case to be in every way expedited."   79 Stat. 442.

that our evaluation of congressional action "must take into account its contemporary legal context." *Cannon* v. *University of Chicago,* 441 U. S. 677, 698–699 (1979); see also *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Curran,* 456 U. S. 353, 381 (1982).

Our holding in *Cannon,* that Title IX of the Education Amendments of 1972 created a private right of action for victims of discrimination in education, relied heavily on the fact that during the 1960's the Court had consistently found such remedies notwithstanding the absence of an express direction from Congress. 441 U. S., at 698; see also *id.,* at 718 (REHNQUIST, J., concurring). Indeed, *Cannon* cited and relied on our earlier decision in *Allen* v. *State Bd. of Elections,* 393 U. S. 544 (1969), holding that private parties may enforce § 5 of the Voting Rights Act, to show that Congress acted against a "backdrop" of decisions in which implied causes of action were regularly found. See 441 U. S., at 698, and nn. 22–23. The Voting Rights Act itself was passed one year after this Court's decision in *J. I. Case Co.* v. *Borak,* 377 U. S. 426 (1964), which applied a highly liberal standard for finding private remedies.

In *Allen* we made two observations about § 5 that apply as forcefully to § 10. We noted that "achievement of the Act's laudable goal could be severely hampered . . . if each citizen were required to depend solely on litigation instituted at the discretion of the Attorney General." 393 U. S., at 556. The same is surely true of § 10.[41] Second, we attached significance to the fact that the Attorney General had urged us to find that private litigants may enforce the Act. *Id.,* at 557, n. 23. The United States takes the same position in

---

[41] In a footnote we observed that a private litigant could always bring suit under the Fifteenth Amendment, but it was the inadequacy of just those suits for securing the right to vote that prompted Congress to enact the statute. See 393 U. S., at 556, n. 21. Similarly with respect to a poll tax, the fact that a suit might be brought directly under the Twenty-fourth Amendment is not a reason for declining to find a statutory remedy.

this case. See Brief for United States as *Amicus Curiae* 25–27.[42]

Congress has not only ratified *Allen's* construction of § 5 in subsequent reenactments, see H. R. Rep. No. 91–397, p. 8 (1970), but extended its logic to other provisions of the Act. Although § 2, like § 5, provides no right to sue on its face, "the existence of the private right of action under Section 2 . . . has been clearly intended by Congress since 1965." S. Rep. No. 97–417, at 30 (citing *Allen*); see also H. R. Rep. No. 97–227, p. 32 (1981). We, in turn, have entertained cases brought by private litigants to enforce § 2. See, *e. g., Chisom* v. *Roemer,* 501 U. S. 380 (1991); *Johnson* v. *De Grandy,* 512 U. S. 997 (1994). It would be anomalous, to say the least, to hold that both § 2 and § 5 are enforceable by private action but § 10 is not, when all lack the same express authorizing language.

Appellees argue that while § 5 creates substantive rights, § 10 merely directs the Attorney General to bring certain types of enforcement actions. Brief for Appellees 42–43. Exactly the same argument was made as to § 5 in *Allen.* But we held there that it was "unnecessary to reach the question" whether § 5 created new rights or only gave plaintiffs new remedies to enforce existing rights, for "[h]owever the Act is viewed, the inquiry remains whether the right or

---

[42] JUSTICE THOMAS attempts to distinguish § 5 and § 10 by arguing that the former describes a "particular class of persons" to be benefited while the latter does not. See *post,* at 287. JUSTICE THOMAS has it backwards. Section 5 states generically that "no person shall be denied the right to vote" by unprecleared changes. With far greater specificity, § 10 states that poll taxes preclude "persons of limited means" from voting or impose unreasonable financial hardships on them and "in some areas ha[ve] the purpose or effect of denying persons the right to vote because of race or color." 42 U. S. C. § 1973h(a). It also declares that "the constitutional right of citizens to vote is denied or abridged in some areas by the requirement of the payment of a poll tax as a precondition to voting." *Ibid.* Section 10 was clearly designed to benefit a limited class of individuals.

remedy has been conferred upon the private litigant."[43]   393 U. S., at 556, n. 20.   Even if it mattered whether § 10 created rights or remedies, the other provisions of the Act indicate that the antipoll tax provision established a right to vote without paying a fee.[44]

Furthermore, when Congress reenacted and extended the life of the Voting Rights Act in 1975, it recognized that private rights of action were equally available under § 10.   Section 3, for example, originally provided for special procedures in any action brought "under any statute to enforce the guarantees of the fifteenth amendment" by the Attorney General.   See 79 Stat. 437.   In 1975, Congress amended that section to cover actions brought by "the Attorney General *or an aggrieved person.*"   42 U. S. C. § 1973a (1988 ed.) (emphasis added).   The Senate Report explained that the purpose of the change was to provide the same remedies to private parties as had formerly been available to the Attorney General alone.   See S. Rep. No. 94–295, pp. 39–40 (1975).[45]   Since § 10 is, by its terms, a statute designed for

---

[43] We do not know, therefore, what JUSTICE THOMAS means when he describes § 5 as conferring a "statutory privilege" on a group of individuals.   See *post*, at 287.   If that phrase refers to a "right," then JUSTICE THOMAS is flatly wrong, for *Allen* itself denies reaching that question. The "guarantee of § 5" to which *Allen* refers is simply its holding that individuals can sue under § 5.   It is circular to rely on that conclusion to distinguish § 5 from § 10, for the question presented here is precisely whether this Court should apply the same logic to § 10.

[44] See § 12(a) (prescribing sanctions for any deprivation or attempted deprivation of "any *right* secured by section . . . 1973h [§ 10]"), 42 U. S. C. § 1973j(a) (1988 ed.) (emphasis added); § 12(c) (prescribing sanctions for any conspiracy to interfere with "any *right* secured by section . . . 1973h [§ 10]"), 42 U. S. C. § 1973j(c) (1988 ed.) (emphasis added).

[45] The Senate Report went on to explain more generally: "In enacting remedial legislation, Congress has regularly established a dual enforcement mechanism.   It has, on the one hand, given enforcement responsibility to a governmental agency, and on the other, has also provided remedies to private persons acting as a class or on their own behalf.   The Commit-

enforcement of the guarantees of the Fourteenth and Fifteenth Amendments, see 42 U. S. C. § 1973h(b) (1988 ed.), Congress must have intended it to provide private remedies.

The same logic applies to § 14(e), added in 1975, which allows attorney fees to be granted to "the prevailing party, *other than the United States*," in any action "to enforce the voting guarantees of the fourteenth or fifteenth amendment." 42 U. S. C. § 1973*l*(e) (1988 ed.) (emphasis added). Obviously, a private litigant is not the United States, and the Attorney General does not collect attorney's fees.[46] Both this section and § 3 thus recognize the existence of a private right of action under § 10.[47]

Last, appellees argue that § 10 does not apply to the Party's nominating convention because a delegate registration fee is not a poll tax. This argument addresses the merits rather than the right to sue. Without reaching the merits, the District Court dismissed appellants' claim because it held there was no private cause of action under § 10. Since we

---

tee concludes that it is sound policy to authorize private remedies to assist the process of enforcing voting rights." S. Rep. No. 94–295, at 40.

[46] The Senate Report states: "Such a provision is appropriate in voting rights cases because there, as in employment and public accomodations *[sic]* cases, and other civil rights cases, Congress depends heavily upon private citizens to enforce the fundamental rights involved. Fee awards are a necessary means of enabling private citizens to vindicate these Federal rights." *Ibid.*

[47] Appellees argue that any congressional action taken in 1975 cannot support the existence of an implied private right of action because this Court began applying a stricter test for implied rights in *Cort* v. *Ash*, 422 U. S. 66 (1975). We note that *Cort* was decided on June 17, 1975, while the amendments to the Act were passed on August 6 of the same year. Pub. L. 94–73, 89 Stat. 400. Seven weeks—in the context of a bill that was first proposed more than a year earlier—is scarcely enough time for Congress to take account of a change in the "contemporary legal context," especially one whose nature and impact were the subject of some dispute at the time. See *Cannon* v. *University of Chicago*, 441 U. S. 677, 739–743 (1979) (Powell, J., dissenting) (arguing that *Cort* *relaxed* the standards for finding implied rights of action).

hold that this conclusion is incorrect, we postpone any consideration of the merits until after they have been addressed by the District Court.[48]

The judgment of the District Court is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BREYER, with whom JUSTICE O'CONNOR and JUSTICE SOUTER join, concurring in the judgment.

One historical fact makes it particularly difficult for me to accept the statutory and constitutional arguments of the appellees. In 1965, to have read this Act as excluding all political party activity would have opened a loophole in the statute the size of a mountain. And everybody knew it. They knew that, despite the enactment of the Fourteenth and Fifteenth Amendments, African-Americans had been systematically deprived of the right to vote in many places and for many years. They knew, too, that States had tried to maintain that status quo through the "all-white" primary—a tactic that tried to avoid the Fifteenth Amendment by permitting white voters alone to select the "all-white" Democratic Party nominees, who were then virtually assured of victory in the general election. Once the Supreme Court held unlawful the "all-white" primary, *Smith* v. *Allwright*, 321 U. S. 649 (1944), the obvious next step would have been to substitute an "all-white" preprimary Democratic Party nominating

---

[48] Appellees make one final argument that this case is moot because the 1994 convention has already been held. We note, however, that the Party has not disavowed the practice of imposing a delegate filing fee for its nominating convention, nor has it returned the $45 collected from appellant Morse. Indeed, the Party has required fees as far back as 1964, and continues to assert that they are necessary to finance its conventions. Like other cases challenging electoral practices, therefore, this controversy is not moot because it is "capable of repetition, yet evading review." *Anderson* v. *Celebrezze*, 460 U. S., at 784, n. 3; *Storer* v. *Brown*, 415 U. S. 724, 737, n. 8 (1974); *Moore* v. *Ogilvie*, 394 U. S. 814, 816 (1969).

process for the "all-white" primary. And, indeed, that is just what happened, though the tactic failed because the Supreme Court held one version of it, the Jaybird Association straw poll, unconstitutional. *Terry* v. *Adams*, 345 U. S. 461 (1953).

In 1965, Congress knew this history well, see, *e. g.*, H. R. Rep. No. 439, 89th Cong., 1st Sess., pp. 6–22 (noting White Primary Cases and discussing failure of case-by-case enforcement of Fifteenth Amendment); S. Rep. No. 162, 89th Cong., 1st Sess., pt. 3 (1965) (same); *South Carolina* v. *Katzenbach*, 383 U. S. 301, 308–315 (1966) (summarizing legislative history), and it knew more besides. It knew that Mississippi had just sent to the Democratic National Convention an "all-white" delegation, selected in a process of party precinct meetings, caucuses, and conventions from which "Negroes" were excluded. See, *e. g.*, Hearings on H. R. 6400 before Subcommittee No. 5 of the House Committee on the Judiciary, 89th Cong., 1st Sess., pp. 456–457 (1965) (testimony of Rep. Bingham) (hereafter H. R. 6400 Hearings). How is it possible that a Congress, knowing this obvious history, would have wanted to enact a "voting rights" law containing a major and obvious loophole that would allow such practices to continue, thereby threatening to destroy in practice the very promise of elementary fairness that the Act held out?

The answer is that Congress did not want to enact a statute with that loophole, and it did not do so. That is why Representative Bingham said, in offering the amendment that brought voting for "party office" within the Act, see 42 U. S. C. § 1973*l*(c)(1) (1988 ed.), that

> "to be most effective, [the Act] should include express coverage of party functions which directly, or indirectly, affect the primary or general elections in any State." H. R. 6400 Hearings, at 457.

See also *ibid.* (explaining proposal as covering "political party meetings, councils, conventions, and referendums

which lead to endorsement or selection of candidates who will run in primary or general elections"). And it is why he told the full House of Representatives (after the Committee had accepted his amendment) that his change

> "would extend the protections of the bill to the type of situation which arose last year when the regular Democratic delegation from Mississippi to the Democratic National Convention was chosen through a series of Party caucuses and conventions from which Negroes were excluded." 111 Cong. Rec. 16273 (1965).

See also H. R. Rep. No. 439, *supra*, at 32.

Representative Bingham's amendment, as the dissents point out, applies only to actions taken by "State or political subdivision." 42 U. S. C. § 1973c (1988 ed.). But that language did not *automatically* place a party's all-white evasive maneuvers beyond the statute's reach, because the Supreme Court had already held that the word "State" as it appears in the Fifteenth Amendment could constitutionally apply to certain activities of political parties, such as nominating activities. See. *Smith, supra,* at 662–666; *Terry, supra,* at 473 (opinion of Frankfurter, J.) ("The application of the prohibition of the Fifteenth Amendment to 'any State' is translated by legal jargon to read 'State action'"). The question before us is whether in 1965 Congress *intended* its words to place even a party's convention-based, all-white evasive maneuvers beyond the statute's reach, thereby ignoring even the Mississippi Democratic Party's efforts the year before to use an "all-white" convention process to help nominate a candidate for President of the United States.

The answer to this question must be "no." In light of history—that of Jim Crow and that of the Act—one cannot understand Congress as having intended to endorse any such evasion. And that is as far as we need go to answer the statutory question presented by this case.

We need not go further in determining when party activities are, in effect, substitutes for state nominating primaries because the case before us involves a nominating convention that resembles a primary about as closely as one could imagine. The convention (but for the $45 fee) was open to any voter declaring loyalty to the Republican Party of Virginia (Party), just like a primary. The Party itself had previously selected the primary method to choose its nominee (in 1990, the year of the immediately preceding United States Senate race, the Party canceled its scheduled primary when no candidate filed to oppose the incumbent, App. 24), but changed its mind in 1994 without asking the Justice Department to "preclear" the switch. And the Party chose to avail itself of special state-law preferences, in terms of ballot access and position, offered to the convention's choice. Va. Code Ann. §§ 24.2–511(A), 535, 613 (1993).

Nor need we go further to decide just which party nominating convention practices fall within the scope of the Act. There are already substantial limits as to which voting-related "practices and procedures" must be precleared. See *Presley* v. *Etowah County Comm'n*, 502 U. S. 491, 502–503 (1992) (gathering cases and setting out four preclearance categories: changes involving "the manner of voting[,] . . . candidacy requirements and qualifications[,] . . . the composition of the electorate that may vote[,] . . . [and] the creation or abolition of an elective office"). Thus, for example, the Party here states that besides nominating candidates, "other business at its conventions" includes "adoption of resolutions or platforms outlining the philosophy [of the Party]" and rules governing its internal operation. App. 24. Under *Presley*, these activities are very likely not subject to preclearance. See also 28 CFR § 51.7 (1995) (making clear that "changes with respect to the recruitment of party members, the conduct of political campaigns, and the drafting of party platforms are not subject to the preclearance requirement").

I would note, moreover, that the lower courts have applied § 5 only to a small subcategory of party rules. See *Hawthorne* v. *Baker*, 750 F. Supp. 1090, 1094–1095 (MD Ala. 1990) (three-judge court), vacated as moot, 499 U. S. 933 (1991); *Fortune* v. *Kings County Democratic County Committee*, 598 F. Supp. 761, 764–765 (EDNY 1984) (three-judge court) *(per curiam)*; *MacGuire* v. *Amos*, 343 F. Supp. 119, 121 (MD Ala. 1972) (three-judge court) *(per curiam)*.

While these limitations exclude much party activity—including much that takes place at an assembly of its members—I recognize that some of the First Amendment concerns raised by the dissents may render these limits yet more restrictive in the case of party conventions. But the practice challenged here—the fee—lies within the Act, and well outside the area of greatest "associational" concern. Like the more obviously evasive "all-white" devices, it is of a kind that is the subject of a specific constitutional Amendment. U. S. Const., Amdt. 24, § 1 (banning poll tax).

We go no further in this case because, as the dissents indicate, First Amendment questions about the extent to which the Federal Government, through preclearance procedures, can regulate the workings of a political party convention, are difficult ones, see, *e. g., Eu* v. *San Francisco County Democratic Central Comm.*, 489 U. S. 214 (1989), as are those about the limits imposed by the state-action cases. See *Edmonson* v. *Leesville Concrete Co.*, 500 U. S. 614 (1991). Those questions, however, are properly left for a case that squarely presents them.

Such questions, we are satisfied, are not so difficult as to warrant interpreting this Act as containing a loophole that Congress could not have intended to create. See, *e. g., Terry* v. *Adams*, 345 U. S. 461 (1953); *Smith* v. *Allwright*, 321 U. S. 649 (1944). See also *Eu, supra*, at 232 (recognizing that the First Amendment, while guaranteeing associational rights, does not bar "intervention . . . necessary to prevent the dero-

gation of the civil rights of party adherents"); *Presley, supra,* at 502–503 (setting out which voting-related practices are subject to preclearance); Brief for Appellees 6–7 (agreeing § 5 reaches certain primary-related party activity).

An interpretation of §§ 5 and 14(c)(1), in light of the language, history, and purpose of the Act, sufficient to avoid that loophole is sufficient to answer the question presented here. In this case, I conclude that this Court has not decided the exact boundaries that the Constitution draws around the subcategory of party rules subject to § 5. Further definition should await another day.

Finally, I agree with JUSTICE STEVENS that Congress must be taken to have intended to authorize a private right of action to enforce § 10 of the Act, 42 U. S. C. § 1973h (1988 ed.). He explains, *ante,* at 231–232, that the rationale of *Allen* v. *State Bd. of Elections,* 393 U. S. 544, 556–557 (1969) (Congress established private right of action to enforce § 5), applies with similar force not only to § 2 but also to § 10. Cf. S. Rep. No. 97–417, pt. 1, p. 30 (1982) (implied private right of action to enforce § 2 "has been clearly intended by Congress since 1965"). The differences in statutory language and structure between §§ 5 and 10 are not determinative. *Ante,* at 232. In addition, I do not know why Congress would have wanted to treat enforcement of § 10 differently from enforcement of §§ 2 and 5, particularly after 1975. In that year, Congress focused on § 10, deleted the then-obsolete § 10(d), made technical amendments to § 10(b), and thereby indicated its belief that § 10 remained an important civil rights provision. Pub. L. 94–73, § 408, 89 Stat. 405. See also S. Rep. No. 94–295, pp. 40–41 (1975) (reiterating general importance of private enforcement of Act); H. R. Report No. 94–196, pp. 33–34 (1975) (same). For these reasons, I believe Congress intended to establish a private right of action to enforce § 10, no less than it did to enforce §§ 2 and 5. I express no view as to the merits of the underlying § 10 claim.

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, dissenting.

"Any interference with the freedom of a party is simultaneously an interference with the freedom of its adherents." *Sweezy* v. *New Hampshire,* 354 U. S. 234, 250 (1957). For that reason, we have always treated government assertion of control over the internal affairs of political parties—which, after all, are simply groups of like-minded individual voters—as a matter of the utmost constitutional consequence. See, *e. g., Democratic Party of United States* v. *Wisconsin ex rel. La Follette,* 450 U. S. 107, 121–122 (1981); *Cousins* v. *Wigoda,* 419 U. S. 477, 487–488 (1975); *O'Brien* v. *Brown,* 409 U. S. 1, 4–5 (1972) *(per curiam).* What is at issue in this case, therefore, is not merely interpretation of § 5 of the Voting Rights Act, 42 U. S. C. § 1973c, but, inextricably bound up with that interpretation, the First Amendment freedom of political association.

There are several respects in which both JUSTICE STEVENS' opinion and JUSTICE BREYER's opinion concurring in the judgment constitute remarkable departures from the settled course of our First Amendment jurisprudence. The most obvious, perhaps, is their refusal to consider the present application of § 5 unconstitutional on the basis of "hypothetical cases unrelated to the facts of this case [that] might implicate First Amendment concerns." STEVENS, J., *ante,* at 228.[1] Instead, they "leave consideration of hypothetical concerns for another day," *ante,* at 229, and reserve such "difficult" questions "for a case that squarely presents them," BREYER, J., *ante,* at 239. That is a luxury our precedents do not allow. It has been a constant of our free-speech jurisprudence that claimants whose First Amendment rights are affected may challenge a statute, not merely on the ground that its specific application to them is unconstitutional, but

---

[1] For brevity's sake, I cite each of today's opinions by the name of its author.

also on the ground that its application is void in a substantial number of other contexts that arguably fall within its scope. This principle of "overbreadth" has been applied not only in the context of freedom of speech narrowly speaking, but also in the context of the freedom to associate for the purpose of political speech. See, e. g., *United States* v. *Robel*, 389 U. S. 258, 265–266 (1967); *Elfbrandt* v. *Russell*, 384 U. S. 11, 18–19 (1966).

Thus, to satisfy oneself that the particular practice challenged here lies "well outside the area of greatest 'associational' concern," BREYER, J., *ante*, at 239, is to take only the first and smallest step in treating the weighty constitutional question posed by application of § 5 to political parties. In this First Amendment context, to "go no further than necessary to decide the case at hand" means going far enough to assure against overbreadth. We must do that whenever "rights of association [are] ensnared in statutes which, by their broad sweep, might result in burdening innocent associations." *Broadrick* v. *Oklahoma*, 413 U. S. 601, 612 (1973) (citing, *inter alia, Keyishian* v. *Board of Regents of Univ. of State of N. Y.*, 385 U. S. 589 (1967)). JUSTICE STEVENS does not assert that applying § 5 to party activity passes First Amendment muster except "in the case before us," *ante*, at 229, and JUSTICE BREYER acknowledges that the First Amendment may bar application of § 5 to other convention activity, see *ante*, at 239. Yet despite these indications of overbreadth, neither opinion attempts to provide what our cases require: a "limiting construction or partial invalidation" that will "remove the seeming threat or deterrence to constitutionally protected expression," *Broadrick, supra*, at 613.

Besides flouting the doctrine of overbreadth, the opinions' refusal to provide "[f]urther definition" of § 5's application to political parties, BREYER, J., *ante*, at 240, leaves political parties without guidance as to "when [their] activities are, in effect, substitutes for state nominating primaries," *ante*, at

238, and as to "which party nominating convention practices fall within the scope of the Act," *ibid.*[2] Before today, this Court has not tolerated such uncertainty in rules bearing upon First Amendment activities, because it causes persons to refrain from engaging in constitutionally protected conduct for fear of violation. See, *e. g., Baggett* v. *Bullitt,* 377 U. S. 360, 372 (1964). Surely such an effect can be expected here. Party officials will at least abstain from proceeding with *certain* convention activities without notification; and in light of the high degree of uncertainty they may well decide to hold no conventions *at all.*

Another respect in which the Court today diverges from our free-speech jurisprudence is even more astounding, if possible, than its disregard of the doctrines of overbreadth and vagueness. From reading the majority's two opinions, one would surmise that the only constitutional question at issue is whether the First Amendment permits the Federal Government to make unlawful and set aside party rule changes designed to hinder racial minorities' full participation in election-related functions. But this statute does *not* present only that question, any more than a statute establishing a Board of Obscenity Censors, to which films or books must be submitted for approval before publication, presents only the question whether the First Amendment permits the prohibition of obscenity. See, *e. g., Freedman* v. *Maryland,*

---

[2] JUSTICE BREYER apparently thinks that the First Amendment concerns raised by appellees are minimal because many activities engaged in by a party at its convention "are very likely not subject to preclearance." *Ante,* at 238. Of course, a mere "very likelihood" that failure to preclear a particular activity will not result in nullification of the work of the convention is hardly sufficient to induce a party organizer to take the chance. In any event, I find curious the proposition that certain subsidiary determinations of the convention, such as " 'adoption of resolutions or platforms outlining the philosophy [of the Party],' " *ibid.,* are not subject to Government oversight, whereas the determination of who may attend the convention—upon which *all* else depends—is subject to Government oversight. That is a good bargain for the tyrant.

380 U. S. 51 (1965); *Bantam Books, Inc.* v. *Sullivan*, 372 U. S. 58 (1963). A point entirely ignored by JUSTICES STEVENS and BREYER is that this case involves a *classic prior restraint.*

Our cases have heavily disfavored all manner of prior restraint upon the exercise of freedoms guaranteed by the First Amendment. Although most often imposed upon speech, prior restraints are no less noxious, and have been no less condemned, when directed against associational liberty (with which, we have said, freedom of speech "overlap[s] and blend[s]," *Citizens Against Rent Control/Coalition for Fair Housing* v. *Berkeley,* 454 U. S. 290, 300 (1981)). See *Thomas* v. *Collins,* 323 U. S. 516, 539–540 (1945); *Carroll* v. *President and Comm'rs of Princess Anne,* 393 U. S. 175, 180–185 (1968); cf. *Healy* v. *James,* 408 U. S. 169, 184 (1972). Today, however, a majority of the Court readily accepts the proposition that § 5 can subject this First Amendment freedom *to a permit system,* requiring its exercise to be "precleared" with the Government even when it is not being used unlawfully. The Court thus makes citizens supplicants in the exercise of their First Amendment rights.

As the five Justices who support the judgment of the Court choose to read this statute, a political party (or at least one that the State has awarded a place on the ballot[3]) can make *no* change in its practices or procedures that might affect a voter's capacity to have his candidate elected—no

---

[3] JUSTICE STEVENS makes much of the fact that the nominee selected by the Republican Party of Virginia, by reason of the outcome of prior elections, had automatically been given a place on the primary ballot, see *ante,* at 195–199, but he also explains his interpretation of § 5 as "follow[ing] directly from our decision in *Terry* [v. *Adams,* 345 U. S. 461 (1953)]," *ante,* at 215, a case in which the private party's nominating election "did not involve the State's electoral apparatus in even the slightest way," *ibid.* JUSTICE BREYER alludes to Virginia's election laws, see *ante,* at 238, but they are plainly incidental to his analysis, see *ante,* at 235–239. So one must assume that what the Court today holds for parties whose nominees are automatically listed is true for other parties as well.

matter how race neutral in purpose and effect—*unless it first obtains prior clearance by the Government,* see STE-VENS, J., *ante,* at 203–207; BREYER, J., *ante,* at 237–239. Any change not precleared—after a proceeding in which the burden rests *on the party* to show *absence* of discriminatory purpose and effect, see *City of Rome* v. *United States,* 446 U. S. 156, 172–173, 183, n. 18 (1980)—can be enjoined. Given that political parties are organized with the near-exclusive purpose of influencing the outcomes of elections, I think it obvious that as construed today, §5 requires political parties to submit for prior Government approval, and bear the burden of justifying, virtually every decision of consequence regarding their internal operations. That is the most outrageous tyranny. A freedom of political association that must await the Government's favorable response to a "Mother, may I?" is no freedom of political association at all.

There would be reason enough for astonishment and regret if today's judgment upheld a statute clearly imposing a prior restraint upon private, First Amendment conduct. But what makes today's action astonishing and regrettable beyond belief is that this Court itself is the architect of a prior restraint that the law does not clearly express. And here is yet another respect in which today's opinions ignore established law: their total disregard of the doctrine that, where ambiguity exists, statutes should be construed to avoid substantial constitutional questions. That has been our practice because we presume that "Congress, which also has sworn to protect the Constitution, would intend to err on the side of fundamental constitutional liberties when its legislation implicates those liberties." *Regan* v. *Time, Inc.,* 468 U. S. 641, 697 (1984) (STEVENS, J., concurring in judgment in part and dissenting in part). We have in the past relied upon this canon to construe statutes narrowly, so as not to impose suspect prior restraints. For example, in *Lowe* v. *SEC,* 472 U. S. 181 (1985), we held that a statute requiring all "investment advisors" to register with the

Securities and Exchange Commission, see 15 U. S. C. § 80b–3, does not extend to persons who publish "nonpersonalized" investment advice such as periodic market commentary—thereby avoiding the question whether Congress could constitutionally require such persons to register. *Lowe, supra,* at 190, 204–205, and n. 50. How insignificant that prior restraint when compared with the requirement for preclearance of all changes in self-governance by political parties.

What drives a majority of the Court to find a prior restraint where the text does not demand (or even suggest) it is the notion that it "strains credulity" to think that Congress would enact a Voting Rights Act that did *not* reach political-party activity, STEVENS, J., *ante,* at 217. Congress, the majority believes, "could not have intended" such a result, BREYER, J., *ante,* at 239. I doubt the validity of that perception; the assumption it rests upon—that a legislature never adopts half-way measures, never attacks the easy part of a problem without attacking the more sensitive part as well—seems to me quite false. Indeed, the one-step-at-a-time doctrine that we regularly employ in equal protection cases is based on precisely the opposite assumption. See, *e. g., Williamson* v. *Lee Optical of Okla., Inc.,* 348 U. S. 483, 488–489 (1955).

Moreover, even if one were to accept the majority's question-begging assumption that Congress *must* have covered political-party activity, and even if one were to credit their sole textual support for such coverage, today's decision to impose a prior restraint upon purely private, political-party activity would still be incomprehensible. The sole textual support adduced by the two opinions consists of § 14's reference to elections for "party office," and § 2's reference to "the political processes leading to nomination or election." See STEVENS, J., *ante,* at 207–209; BREYER, J., *ante,* at 236–237. JUSTICE THOMAS gives compelling reasons why these phrases cannot bear the meaning the majority would ascribe, see *post,* at 277–282. But even accepting that they mean

what JUSTICES STEVENS and BREYER say, all that the phrase in § 14 shows is that *some portion of the Act* reaches private, political-party conduct; and all that the phrase in § 2 shows is that (at least in some circumstances) *§ 2* does so. *Nothing* in the text, nor anything in the assumption that Congress *must* have addressed political-party activity, compels the conclusion that Congress addressed political-party activity *in the preclearance, prior-restraint scheme of § 5,*[4] which is of course the only question immediately before us. Thus, the only real credulity strainer involved here is the notion that Congress would impose a restraint bearing a "heavy presumption against its constitutional validity," *Bantam Books*, 372 U. S., at 70, in such a backhanded fashion— saying simply "State[s]" and "political subdivision[s]" in § 5, but meaning political parties as well. Because I find that impossible to believe, I respectfully dissent.

JUSTICE KENNEDY, with whom THE CHIEF JUSTICE joins, dissenting.

I join Part II of JUSTICE THOMAS' dissent, which demonstrates that § 10 of the Voting Rights Act, 42 U. S. C. § 1973h (1988 ed.), does not create a private right of action, *post*, at 286–289.

With respect to § 5 of the Act, § 1973c, this statutory construction case does not require us to explore the full reach

---

[4] The Court majority would respond, perhaps, that the phrase "State or political subdivision" in § 5 should be read to have the same meaning that it has in § 2. Of course it normally should. But if the majority fancies itself confronted with the choice between departing from that general rule of construction (which, like all rules of construction, can be overcome by other indication of statutory intent, see, *e. g.*, *Helvering* v. *Stockholms Enskilda Bank*, 293 U. S. 84, 86–88 (1934)) and violating the inflexible principle that courts should not needlessly interpret a statute to impose a prior restraint upon private political activity, it is not debatable where the outcome must lie. Of course, the imagined conflict between the rule and the principle disappears if "State or political subdivision" is given its natural meaning in *both* § 5 and § 2, subjecting political parties to neither.

of Congress' substantial power to enforce the Thirteenth, Fourteenth, and Fifteenth Amendments. Cf., *e. g., City of Rome* v. *United States,* 446 U. S. 156, 173–182 (1980). Nor does it present the question whether the rule of attribution we have adopted in the state-action cases would, of its own force and without statutory implementation, extend the guarantees of the Equal Protection Clause to these appellants. The state-action doctrine and case authorities such as *Smith* v. *Allwright,* 321 U. S. 649 (1944), and *Terry* v. *Adams,* 345 U. S. 461 (1953), may be of considerable relevance to equal protection or other constitutional challenges still pending before the District Court, see *ante,* at 191–192 (opinion of STEVENS, J.), but those matters need not be discussed here. It would be unwise to do so; for, with full recognition of the vital doctrine that *Smith, Terry,* and kindred cases elaborate when we confront discrimination in the participatory processes that are the foundation of a democratic society, we have been cautious to preserve the line separating state action from private behavior that is beyond the Constitution's own reach. " 'Careful adherence to the "state action" requirement preserves an area of individual freedom by limiting the reach of federal law' and avoids the imposition of responsibility on a State for conduct it could not control." *National Collegiate Athletic Assn.* v. *Tarkanian,* 488 U. S. 179, 191 (1988), quoting *Lugar* v. *Edmondson Oil Co.,* 457 U. S. 922, 936–937 (1982).

It is "unnecessary to traverse that difficult terrain in the present case," *Lebron* v. *National Railroad Passenger Corporation,* 513 U. S. 374, 378 (1995), because § 5 of the Voting Rights Act does not reach all entities or individuals who might be considered the State for constitutional purposes. Congress was aware of the difference between the State as a political, governing body and other actors whose conduct might be subject to constitutional challenge or the congressional enforcement power, and intended § 5 to reach only the former. JUSTICE THOMAS explains why § 5, both by its

terms and with the gloss placed on it in *United States* v. *Sheffield Bd. of Comm'rs*, 435 U. S. 110 (1978), does not reach the Republican Party of Virginia's actions. *Post*, at 254–263. Furthermore, Congress demonstrated its ability to distinguish between the State and other actors in the text of the Act itself. Section 11 of the Act makes it unlawful for any "person acting under color of law" to "fail or refuse to permit any person to vote who is entitled to vote under" specified provisions of the Act, or to "willfully fail or refuse to tabulate, count, and report such person's vote," 42 U. S. C. § 1973i(a), and also provides that "[n]o person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce . . . any person for voting or attempting to vote," § 1973i(b).

In the context of the Civil Rights Act of 1871, Rev. Stat. § 1979, 42 U. S. C. § 1983 (1988 ed.), which uses similar language to describe the class of individuals subject to its reach ("[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State"), we have said "'under color' of law has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment." *United States* v. *Price*, 383 U. S. 787, 794, n. 7 (1966). See also *Lugar* v. *Edmondson Oil Co.*, *supra*, at 929; *Rendell-Baker* v. *Kohn*, 457 U. S. 830, 838 (1982); *West* v. *Atkins*, 487 U. S. 42, 49 (1988); *National Collegiate Athletic Assn.* v. *Tarkanian*, *supra*, at 182, n. 4; *Hafer* v. *Melo*, 502 U. S. 21, 28 (1991). There is no apparent reason why the "under color of law" requirement of § 11 should not also be considered coterminous with the state-action requirement of the Amendment that statute enforces, and we should infer from Congress' employment of that requirement an intent to distinguish between the State and those other actors to whom governmental status must be imputed in some instances, cf. *Gustafson* v. *Alloyd Co.*, 513 U. S. 561, 568 (1995) (elementary canon of statutory construction to give a term a "consistent meaning throughout the

Act"). Congress knows the difference between regulating States and other actors, and in § 5 chose only to regulate the States.

The First Amendment questions presented by governmental intrusion into political party functions are a further reason for caution before we adopt a blanket rule that preclearance is required on the theory that when Congress used the word "State" it also meant "political party." Sensitive consideration of the rights of speech and association counsels much restraint before finding that a political party is a state actor for purposes of all preclearance requirements. In particular, we have called for circumspection in drawing the state-action line where political parties and their roles in selecting representative leaders are concerned. See *Cousins* v. *Wigoda,* 419 U. S. 477, 483, n. 4 (1975) (reserving question whether national political party's selection of delegates to nominating convention amounts to state action). See also *id.,* at 492–494 (REHNQUIST, J., concurring in result); *O'Brien* v. *Brown,* 409 U. S. 1, 4–5 (1972) *(per curiam)* (staying order that political party seat certain delegates at its national convention and expressing "grave doubts" about Court of Appeals' action in case raising "[h]ighly important" state-action question); *Republican State Central Comm. of Ariz.* v. *Ripon Society Inc.,* 409 U. S. 1222, 1226–1227 (1972) (REHNQUIST, J., in chambers); *Ripon Society, Inc.* v. *National Republican Party,* 525 F. 2d 567, 574–576 (1975) (en banc), cert. denied, 424 U. S. 933 (1976).

Notwithstanding the terse dismissals of these concerns in the opinions that support today's judgment, *ante,* at 228–229 (opinion of STEVENS, J.); *ante,* at 239 (BREYER, J., concurring in judgment), we have recognized before now the important First Amendment values that attach to a political party's "freedom to identify the people who constitute the association, and to limit the association to those people only." *Democratic Party of United States* v. *Wisconsin ex rel. La*

*Follette,* 450 U. S. 107, 122 (1981). These concerns would provide a sound basis for construing an ambiguous reference to the term "State" to avoid constitutional difficulties. See *Miller* v. *Johnson,* 515 U. S. 900, 924–928 (1995) (refusing to defer to Attorney General's interpretation of § 5 that raised equal protection concerns). Cf. *Gregory* v. *Ashcroft,* 501 U. S. 452, 460–464 (1991) (adopting plain statement rule with respect to statutory ambiguity that implicates Tenth Amendment concerns). Given the absence of any ambiguity in the statutory text before us, there is no basis for a grasping and implausible construction of the Act that brings these constitutional problems to the fore.

We are well advised to remember that Congress, too, can contribute in drawing the fine distinctions required in the balancing of associational and participatory rights. Cf. *United States* v. *Lopez,* 514 U. S. 549, 577 (1995) (KENNEDY, J., concurring) ("[I]t would be mistaken and mischievous for the political branches to forget that the sworn obligation to preserve and protect the Constitution in maintaining the federal balance is their own in the first and primary instance"). No such fine distinctions were attempted, I would submit, in this statute; if anything "strains credulity," *ante,* at 217 (opinion of STEVENS, J.), it is that Congress meant to include the Democratic and Republican Parties when it used the simple word "State" in the Voting Rights Act.

The opinions supporting the judgment express concern that cases like *Smith* and *Terry* would not be covered by the Voting Rights Act were the interpretation adopted today to be rejected. To begin with, of course, we should note that the Voting Rights Act was not needed to invalidate the discrimination that occurred in those cases. The Constitution of its own force did that. What we confront here, instead, is a statutory scheme in which entities seeking preclearance must ask a political officer (the Attorney General of the United States) for permission to change various internal procedures. It is a far reach to suppose that Congress required

this for ordinary party processes. The White Primary Cases involved ever-increasing efforts on the part of the State itself to camouflage discrimination in the guise of party activity. See *ante*, at 211–213 (opinion of STEVENS, J.). There is no claim in this case that the Commonwealth's statutory policy of allowing the Republican Party (and any other political party that receives at least 10 percent of the vote in either of two preceding elections) the option to nominate by primary or convention, Va. Code Ann. § 24.2–509 (1993), is void on account of the Commonwealth's failure to preclear that policy in accordance with the requirements of § 5. Rather, the argument embraced today is that the Party itself acted in violation of § 5 by failing to preclear the $45 registration fee. We would face a much different case if a State, without first seeking § 5 preclearance, restructured its election laws in order to allow political parties the opportunity to practice unlawful discrimination in the nominating process. If, as seems likely, such a change constituted a "voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964," 42 U. S. C. § 1973c, § 5 would require preclearance by the State. For this reason, appellants' counsel overstated the matter by arguing that if Congress intended to reach only States *qua* States, and not political parties, "the Voting Rights Act would have been strangled at its birth." Tr. of Oral Arg. 12.

Although Congress enacted § 5 to counteract the notorious history of attempts to evade the guarantees of equal treatment in voting, *South Carolina* v. *Katzenbach*, 383 U. S. 301, 327–328 (1966), that history does not give us license to expand the Act's coverage beyond the boundaries of the statutory text, *Presley* v. *Etowah County Comm'n*, 502 U. S. 491, 509 (1992). I would adhere to that text, which reflects a decided intent on Congress' part to reach governmental, not private, entities. With respect, I dissent.

JUSTICE THOMAS, with whom THE CHIEF JUSTICE and JUSTICE SCALIA join, and with whom JUSTICE KENNEDY joins as to Part II, dissenting.

Two discrete questions of statutory interpretation control appellants' claim under § 5 of the Voting Rights Act: whether the Republican Party of Virginia is a "State or political subdivision" and, if so, whether the fee imposed upon its conventioneers constitutes a procedure "with respect to voting." 42 U. S. C. § 1973c. The plain meaning of the Voting Rights Act mandates a negative answer to both of these questions. The text of the Act also forecloses the availability of a private cause of action under § 10. I therefore dissent.

## I

### A

Section 5 declares that, "[w]henever a *State or political subdivision* . . . shall enact or seek to administer" any change with respect to voting, it may not institute that change absent preclearance. 42 U. S. C. § 1973c (emphasis added). Only when a "State or political subdivision" promulgates new voting rules is § 5 even arguably implicated. See *United States* v. *Sheffield Bd. of Comm'rs*, 435 U. S. 110, 141 (1978) (STEVENS, J., dissenting) ("As a starting point, it is clear that [§ 5] applies only to actions taken by two types of political units—States or political subdivisions"). Thus, the first issue to be decided here is whether the Republican Party of Virginia is the type of entity that must comply with the preclearance requirement of § 5.

JUSTICE STEVENS does not directly address this threshold question of pure statutory interpretation. He begins with the Attorney General's regulation, rather than with the text of § 5 itself. Cf. *Norfolk & Western R. Co.* v. *Train Dispatchers*, 499 U. S. 117, 128 (1991) ("As always, we begin with the language of the statute and ask whether Congress has

spoken on the subject before us"). In my opinion, the Republican Party of Virginia is not a "State or political subdivision" within the meaning of §5, and that statute is therefore not triggered in this case.

1

The Voting Rights Act provides no definition of the term "State." When words in a statute are not otherwise defined, it is fundamental that they "will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin* v. *United States*, 444 U. S. 37, 42 (1979). The ordinary meaning of the word "State" does not encompass a partisan group such as the Republican Party of Virginia. Rather, that word—particularly when capitalized—is generally understood to mean one of the 50 constituent States of the Union. See Webster's New International Dictionary 2461 (2d ed. 1957) (defining "State" as "any body of people occupying a definite territory and politically organized under one government, esp. one that is a sovereign, or not subject to external control; . . . Cf. COMMONWEALTH"). Indeed, it nearly belabors the point to explain that, in common parlance, "State" normally refers to a geographical unit of the United States, such as California or Massachusetts. Our own opinions in §5 cases use the word in this natural fashion. See, *e. g., United States* v. *Sheffield Bd. of Comm'rs, supra*, at 113 (§5 "requires that *States, like Alabama*," preclear new voting rules) (emphasis added); *Hadnott* v. *Amos*, 394 U. S. 358, 365–366 (1969) (§5 "provides that whenever *States like Alabama* seek to administer" voting changes, they must preclear) (emphasis added). Even JUSTICE STEVENS employs "State" in its usual sense. See *ante*, at 193 ("*Virginia* is one of the seven *States* to which the §4 coverage formula was found applicable . . . . The entire *Commonwealth* has been subject to the preclearance obligation of §5 ever since") (emphasis added).

That the statutory term "State" should be applied in light of its ordinary meaning is reinforced by the Act's definition

of the term "political subdivision." Section 14(c)(2) states that " 'political subdivision' shall mean any county or parish," with certain exceptions not relevant here. 42 U. S. C. § 1973*l*(c)(2). As appellants' counsel explained at oral argument, the phrase "political subdivision" refers to "particular geographic regions" within a State, such as New York's Westchester County. Tr. of Oral Arg. 15–16. See also *United States* v. *Sheffield Bd. of Comm'rs, supra,* at 128, n. 15 (§ 14(c)(2) "obviously refer[s] to a geographic territory, and the usages of 'political subdivision' in the Act and the legislative history leave no doubt but that it is in this sense that Congress used the term").[1] Given that limited understanding of "political subdivision," it would be odd indeed if the term "State," which immediately precedes "political subdivision," did not have an analogous meaning. The terms "State" and "political subdivision" should both be construed to refer solely to the various territorial divisions within a larger unit of territorially defined government.

There is further statutory evidence to support this interpretation of "State." The Act elsewhere speaks of the "territory" of a State or political subdivision. See, *e. g.,* § 1973b(a)(1)(F) (referring to "such State or political subdivision and all governmental units *within its territory*") (emphasis added). Political parties, of course, are made up not of land, but of people. It is nonsensical to talk of things existing "within [the] territory" of a political party. Also, the definitional section of the Voting Rights Act Amendments of 1970, Pub. L. 91–285, 84 Stat. 316, indicates that Congress uses the word "State" in voting rights statutes to

---

[1] There is thus no colorable argument in this case that the Party is a "political subdivision" within the meaning of § 14(c)(2); it is not a geographic territory, such as a "county or parish," within a State. Appellants assert no such claim, apparently in recognition of the weakness of the argument. If the Party falls under § 5, it could only be because it is a "State" or state actor, as appellants and the United States maintain. See *infra,* at 264.

connote geographic territories, not political parties. See 42 U. S. C. § 1973aa–1(h) (defining, for purposes of § 202 of the Extension Act, "[t]he term 'State'" as "each of the several States and the District of Columbia").

A State, of course, cannot "enact or seek to administer" laws without resort to its governmental units. § 1973c. A State necessarily operates through its legislative, executive, and judicial bodies. When the legislature passes a law, or an administrative agency issues a policy directive, official action has unquestionably been taken in the name of the State. Accordingly, voting changes administered by such entities have been governed consistently by § 5. See, e. g., *Allen* v. *State Bd. of Elections*, 393 U. S. 544 (1969) (requiring pre-clearance of amendments to Mississippi Code enacted by state legislature and bulletin distributed by Virginia Board of Elections). See also *United States* v. *Saint Landry Parish School Bd.*, 601 F. 2d 859, 864, n. 8 (CA5 1979) ("The cases uniformly speak of § 5 as applying to 'enactments,' 'legislation,' 'regulations,' and 'laws'—all actions taken by the governmental authority of state"). Unlike the Virginia General Assembly, however, the Republican Party of Virginia is not an organ of the State through which the State must conduct its affairs, and the Party has no authority to formulate state law. The Party's promulgations thus cannot be within § 5's reach of "any state enactment which alter[s] the election law of a covered State." *Allen* v. *State Bd. of Elections*, *supra*, at 566 (quoted *ante*, at 204).

Although JUSTICE STEVENS points to past preclearance submissions as evidence that § 5 covers political parties, *ante*, at 200–201, n. 18, those submissions are largely irrelevant to the meaning of § 5. It should come as no surprise that once the Attorney General promulgated a regulation expressly covering political parties, 28 CFR § 51.7 (effective Jan. 5, 1981), some of those organizations requested preclearance and the Justice Department processed their requests. Tellingly, JUSTICE STEVENS is able to cite only a handful of party

submissions that predate the Attorney General's regulation.[2] This fact confirms what common sense instructs: Most people who read § 5 simply would not think that the word "State" embraces political parties. This commonsense understanding also explains why virtually every one of this Court's § 5 cases has involved a challenge to, or a request for approval of, action undertaken by a State or a unit of state government.[3]

---

[2] JUSTICE STEVENS has discovered five instances of such party submissions. See *ante*, at 200–201, n. 18. Per year, however, at least several thousand preclearance requests are sent to the Attorney General. See, *e. g.*, Annual Report of the Attorney General 161 (1982) ("During the year, over 2,800 submissions involving more than 13,300 voting-related changes were submitted to the Attorney General under Section 5"); Annual Report of the Attorney General 131 (1986) ("During fiscal year 1986, over 3,700 submissions involving more than 20,000 changes were submitted to the Attorney General under Section 5").

[3] See *Presley* v. *Etowah County Comm'n*, 502 U. S. 491 (1992); *Clark* v. *Roemer*, 500 U. S. 646 (1991); *Pleasant Grove* v. *United States*, 479 U. S. 462 (1987); *McCain* v. *Lybrand*, 465 U. S. 236 (1984); *NAACP* v. *Hampton County Election Comm'n*, 470 U. S. 166 (1985); *City of Lockhart* v. *United States*, 460 U. S. 125 (1983); *Port Arthur* v. *United States*, 459 U. S. 159 (1982); *Hathorn* v. *Lovorn*, 457 U. S. 255 (1982); *Blanding* v. *DuBose*, 454 U. S. 393 (1982); *McDaniel* v. *Sanchez*, 452 U. S. 130 (1981); *City of Rome* v. *United States*, 446 U. S. 156 (1980); *Dougherty County Bd. of Ed.* v. *White*, 439 U. S. 32 (1978); *Berry* v. *Doles*, 438 U. S. 190 (1978); *United States* v. *Sheffield Bd. of Comm'rs*, 435 U. S. 110 (1978); *Morris* v. *Gressette*, 432 U. S. 491 (1977); *United States* v. *Board of Supervisors of Warren Cty.*, 429 U. S. 642 (1977); *Beer* v. *United States*, 425 U. S. 130 (1976); *Richmond* v. *United States*, 422 U. S. 358 (1975); *Connor* v. *Waller*, 421 U. S. 656 (1975); *Georgia* v. *United States*, 411 U. S. 526 (1973); *Perkins* v. *Matthews*, 400 U. S. 379 (1971); *Hadnott* v. *Amos*, 394 U. S. 358 (1969); *Allen* v. *State Bd. of Elections*, 393 U. S. 544 (1969). See also *Arizona* v. *Reno*, 887 F. Supp. 318 (DDC), appeal dism'd, 516 U. S. 1155 (1996).

Over the last 30 years, we have entertained only two § 5 cases brought against political parties. We vacated one when it became moot on appeal, *State Democratic Executive Committee of Alabama* v. *Hawthorne*, 499 U. S. 933 (1991), and summarily affirmed the denial of relief in the other. *Williams* v. *Democratic Party of Georgia*, Civ. Action No. 16286 (ND Ga., Apr. 6, 1972), aff'd, 409 U. S. 809 (1972).

In light of the plain meaning of the phrase "State or political subdivision," I see no reason to defer to the Attorney General's regulation interpreting that statute to cover political parties. See 28 CFR § 51.7 (1995). Though the Party has not challenged the validity of the regulation, it hardly follows that this Court is bound to accept it as authoritative. We defer to the Attorney General on statutory matters within her authority "only if Congress has not expressed its intent with respect to the question, and then only if the administrative interpretation is reasonable." *Presley* v. *Etowah County Comm'n,* 502 U. S. 491, 508 (1992). As explained, § 5 on its face resolves the question whether political parties are subject to the preclearance rule of § 5: A political party is simply not a "State," regardless of the particular activity in which it might be engaging. Congress has conveyed its intent to limit § 5 to the States themselves and their political subdivisions. Accordingly, the regulation warrants no judicial deference. Cf. *id.,* at 508–509 (declining to defer to Attorney General's construction of § 5).[4]

My reading of § 5 is squarely supported by our only precedent on the applicability of § 5 to political parties, *Williams* v. *Democratic Party of Georgia,* Civ. Action No. 16286 (ND Ga., Apr. 6, 1972), aff'd, 409 U. S. 809 (1972). *Williams* held, as a matter of "statutory construction," Civ. Action No. 16286, at 5, that § 5 does not apply to political parties. The District Court stated that "[t]he Act does not refer to actions by political parties but refers to actions by a '*State or political subdivision.*'" *Id.,* at 4. Though the District Court be-

---

[4] JUSTICE STEVENS contends that the foregoing discussion is "surprising because [his] explanation of why § 5 applies to political parties places no reliance on principles of administrative deference." *Ante,* at 222. By presupposing that the regulation is a valid interpretation of § 5, however, JUSTICE STEVENS simply assumes that § 5 could cover political parties. Thus, he does not just defer to the Attorney General's reading of § 5, but displaces § 5 with the regulation. Cf. *Presley* v. *Etowah County Comm'n, supra,* at 508 ("Deference does not mean acquiescence"). For the reasons given above, I would not do the same.

lieved, based on legislative history, that Congress probably meant to include the election of party delegates under the Act, the court felt itself bound by the fact that § 5 addresses only actions of the State. This limitation was further evidenced, in the court's view, by § 5's provision that preclearance be sought by "the chief legal officer or other appropriate official of such State or subdivision." 42 U. S. C. § 1973c. The District Court concluded that the State itself had "no connection" with the delegate selection process other than providing for the public filing of the rules for selection, and that, though the action of the Party might be "state action" in the constitutional sense, § 5 could not be read so broadly. Civ. Action No. 16286, at 5. Essential to the judgment of the District Court in *Williams* was the holding that § 5 does not encompass political parties. The affirmance of that holding, which is entitled to precedential weight, is instructive here.[5]

Contrary to the suggestion of JUSTICE STEVENS, *United States* v. *Sheffield Bd. of Comm'rs*, 435 U. S. 110 (1978), does not support the contention that the Republican Party of Virginia is subject to § 5. See *ante*, at 204, 219. The precise question presented in that case was whether § 5 required the city of Sheffield, Alabama, to preclear a voting change. The

---

[5] JUSTICE STEVENS' attempt to distinguish, and even to draw support from, *Williams* is unpersuasive. See *ante*, at 201–203. The fact that Virginia grants ballot access to the Party's nominee in this case does not establish state involvement in the nominating convention. In holding its convention, the Party exercised no state-delegated power. See *infra*, at 269–276. Further, JUSTICE STEVENS mischaracterizes *Williams* when he declares that the "only" reason that the District Court did not require preclearance was because no adequate administrative procedures existed; the *Williams* court noted that the lack of such procedures buttressed its premise that § 5 applies only to States and political subdivisions. Civ. Action No. 16286, at 4. Finally, 28 CFR § 51.23(b) (1995), which now provides that party officials may submit rules for preclearance, cannot change the language of § 5, which is still limited, as it was at the time *Williams* was decided, to States and political subdivisions.

controversy arose because § 14(c)(2) of the Act defines "political subdivision" as a county or parish, "except that where registration for voting is not conducted under the supervision of a county or parish, the term shall include any other subdivision of a State which conducts registration for voting." 42 U. S. C. § 1973*l*(c)(2). Notwithstanding the facts that the city was not a county or parish and that it did not register voters, the Court concluded that the city was subject to the preclearance requirement of § 5. The essence of *Sheffield*'s rationale was that because the entire State of Alabama was designated for coverage pursuant to § 4(b), the city of Sheffield was covered by § 5 because it was a "political unit" (though not a "political subdivision") within Alabama. 435 U. S., at 127–128.

Whether or not *Sheffield* was correct as an original matter, it stands, at most, for the proposition that a local unit of government, like a city, may be considered the "State" for purposes of § 5: "[Section] 5 . . . applies territorially and includes political units like Sheffield whether or not they conduct voter registration." *Id.*, at 130. In accordance with that proposition, we have applied *Sheffield* to find coverage of other types of governmental bodies under § 5. See, *e. g.*, *Dougherty County Bd. of Ed.* v. *White*, 439 U. S. 32, 45 (1978) (finding § 5 coverage of county school board under *Sheffield* and noting that "[i]f only those *governmental units* with official electoral obligations actuate the preclearance requirements of § 5," the purposes of the Act could be undermined) (emphasis added). But we have never applied *Sheffield* to find a nongovernmental organization to be within the scope of § 5. This is because *Sheffield* says little about the question whether a group that does not operate in the name of the State, or in the name of any governmental unit of a State, must comply with § 5. If anything, *Sheffield* suggests, with respect to this case, that a political party is *not* so obligated, because a political party is quite plainly neither a territorial

division of a State nor a governmental unit acting on behalf of any such territory.

Undoubtedly, *Sheffield* speaks in broad terms when it states that § 5 "applies to all entities having power over any aspect of the electoral process within designated jurisdictions, not only to counties or to whatever units of state government perform the function of registering voters." 435 U. S., at 118 (quoted *ante*, at 204, 220). That language must be viewed in the context of the case, however. The holding of *Sheffield* applies only to governmental bodies within a State—*i. e.*, cities, counties, or municipalities, and their agencies—not to private groups with a partisan, or "political," agenda. See, *e. g.*, *Sheffield*, 435 U. S., at 117 ("We first consider whether Congress intended to exclude from § 5 coverage *political units, like Sheffield*, which have never conducted voter registration"); *id.*, at 124 ("Congress could not have intended § 5's duties to apply only to those *cities* that register voters"); *ibid.* ("local political entities *like Sheffield*" can impair minority votes in ways other than registration) (all emphases added). In the legislative history *Sheffield* cites as support for its holding that "political units" are covered regardless of whether they register voters, every entity mentioned is a governmental one. See *id.*, at 133–134 (cities; school districts; city councils; precincts; county districts; and municipalities). There is no basis in *Sheffield* and its progeny for covering nongovernmental entities under § 5.

Nonetheless, there is a critical similarity between this case and *Sheffield*. Just as in *Sheffield*, a majority of the Court has inflated the phrase "State or political subdivision" to implausible proportions. The dissent in *Sheffield* warned that "the logistical and administrative problems inherent in reviewing *all* voting changes of *all* political units strongly suggest that Congress placed limits on the preclearance requirement." *Id.*, at 147 (STEVENS, J., dissenting). Today, the Justices that support the judgment go much further and re-

quire all "established" political parties, *ante,* at 219, in designated States to preclear all changes " 'affecting voting,' " *ante,* at 227. See also *ante,* at 238 (BREYER, J.) (suggesting that political groups that receive state-law preferences in access to, and placement on, the ballot must preclear "voting-related" changes). As the Solicitor General candidly acknowledged, an "affecting-voting" or "voting-related" rule cannot be limited to practices administered at conventions; it logically extends to practices at all local mass meetings that precede conventions. See Brief for United States as *Amicus Curiae* 20, n. 11. And almost all activity that occurs at a nominating convention theoretically affects voting; indeed, JUSTICE STEVENS is unable to articulate any principled dividing line between that which does and does not relate to voting at a convention. See *ante,* at 227. Thus, today's decision will increase exponentially the number of preclearance requests, for even the most innocuous changes, that the Attorney General must process within a statutorily limited amount of time. See 42 U. S. C. § 1973c (60 days). "[I]t is certainly reasonable to believe that Congress, having placed a strict time limit on the Attorney General's consideration of submissions, also deliberately placed a limit on the number and importance of the submissions themselves. This result was achieved by restricting the reach of § 5 to enactments of either the States themselves or their political subdivisions." *Sheffield, supra,* at 148 (STEVENS, J., dissenting). That the inclusion of political parties under § 5 demeans the preclearance regime and so drastically increases its scope substantially undermines the possibility that Congress intended parties to preclear.

Without so much as a nod to the explicit "State or political subdivision" limitation in § 5, JUSTICE STEVENS substitutes the administrative regulation as the analytical starting point in this case. See *ante,* at 194–195. He apparently does so because the Party failed to challenge the regulation and its counsel stated at oral argument that § 5 could sometimes encompass political parties. See *ante,* at 194–195, 220, n. 32,

222–223, n. 35. We did not take this case to review the District Court's application of the regulation based on the facts of this case, but to decide whether "[§ ]5 of the Voting Rights Act of 1965 require[s] preclearance of a political party's decision . . . to impose" a fee on conventiongoers. Juris. Statement i. Consequently, appellants and the Government argued that the Party was covered as a "State" under § 5, see n. 7, *infra,* and the Party maintained that § 5 "requires action by a State or political subdivision." Brief for Appellees 29. See also *id.,* at 30 ("A political party is not a subdivision or instrumentality of the government [under *Sheffield*]"). JUSTICE STEVENS and JUSTICE BREYER address the question presented, however, only in the course of dismissing the dissents' arguments, and after they reach their respective conclusions.

Furthermore, the tactical or legal error of a litigant cannot define the meaning of a federal statute. See generally *Sibron* v. *New York,* 392 U. S. 40 (1968). Our duty is to read the statute for ourselves. While the regulation may "unambiguously provid[e] that . . . a political party" must preclear, *ante,* at 194 (opinion of STEVENS, J.), the statute does nothing of the sort, regardless of any submission by the Party. Accordingly, I would decide this case on the ground that the Republican Party of Virginia is not a "State" in the ordinary sense of the word. Its rules and policies should therefore not be subject to § 5.[6]

---

[6] JUSTICE STEVENS rejects this reading of § 5 as being "at war with the intent of Congress and with our settled interpretation of the Act." *Ante,* at 220. First, as explained *supra,* at 256–258, and n. 3, 258–261, there is no precedent for the application of § 5 to nongovernmental units; the issue is anything but "settled." JUSTICE STEVENS errs when he states that "[t]he operative test, we have stated repeatedly, is whether a political party exercises power over the electoral process." *Ante,* at 218. We have never made any such statement, because we have never before addressed the question whether political parties are subject to § 5. Second, JUSTICE STEVENS cites only legislative history as evidence of Congress' "unambiguously expressed . . . purpose" that § 5 should apply to the "candidate selection process." *Ante,* at 224. Section 5, of course, could apply in

## 2

To the limited extent that JUSTICE STEVENS and JUSTICE BREYER address the triggering language in § 5, they fail to explain adequately how it is that the Party could qualify as a "State or political subdivision" under the Act. By referring to the White Primary Cases, however, they reveal the only conceivable basis in law for deeming the acts of the Party to be those of the State: the doctrine of state action, as developed under the Fourteenth and Fifteenth Amendments.[7] In attempting to establish the relevance of that

---

the context of the "candidate selection process," if the State itself enacted or sought to administer the contested change. But JUSTICE STEVENS points to nothing in § 5, or even in that statute's legislative history, that expresses any intent to include political parties within the meaning of "State or political subdivision." Finally, it is perfectly reasonable to suppose that the term "State" has a different meaning in § 5 than it does in the Fifteenth Amendment. Cf. *ante*, at 221. This Court has affirmed in other contexts that statutory language does not necessarily mean the same thing as parallel language in the Constitution. For instance, "[a]lthough the language of [28 U. S. C. § 1331 (1982 ed.)] parallels that of the 'Arising Under' Clause of Article III, this Court never has held that statutory 'arising under' jurisdiction is identical to Art. III 'arising under' jurisdiction." *Verlinden B. V. v. Central Bank of Nigeria*, 461 U. S. 480, 494 (1983). Here, the ordinary-meaning rule of statutory construction, which governs the interpretation of § 5, explains why political parties could be covered under the Fifteenth Amendment, but not under § 5: The commonsense definition of "State" is very different from the complex doctrine of state action that this Court has developed as a matter of constitutional law.

[7] In fact, the Government identified our state-action cases under the Fifteenth Amendment as the justification for the Attorney General's regulation on which JUSTICE STEVENS bases his judgment. Brief for United States as *Amicus Curiae* 10–11. Review of the regulation confirms that it is premised upon the notion that the Party's activities can sometimes be treated as those of the State. See 28 CFR § 51.7 (1995) (referring to "public electoral function" carried out by parties and to parties "acting under authority explicitly or implicitly granted by a covered jurisdiction"). Likewise, appellants relied solely on state-action theory as their rationale for bringing the Party within § 5. See Brief for Appellants 14–20, 24–25.

constitutional doctrine to this statutory case, more by repetition than analysis, both opinions suggest that the meaning of the statutory term "State" in §5 is necessarily coterminous with the constitutional doctrine of state action. See, *ante,* at 199–200, 210–219, 221 (opinion of STEVENS, J.); *ante,* at 235–237 (BREYER, J., concurring in judgment). I cannot agree.

The text of §5 does not support this constitutional gloss. There is a marked contrast between the language of §5 and other federal statutes that we have read to be coextensive with the constitutional doctrine of state action. Specifically, 42 U. S. C. §1983 has been accorded a reach equivalent to that of the Fourteenth Amendment. See *Lugar* v. *Edmondson Oil Co.,* 457 U. S. 922, 934–935 (1982); *United States* v. *Price,* 383 U. S. 787, 794, n. 7 (1966). That statute provides a cause of action against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State" deprives any citizen of federal constitutional or statutory rights. 42 U. S. C. §1983. Section 1983's coverage reasonably extends beyond official enactments of the State, since it expressly provides for coverage of persons who act under authority of the State. If Congress intended to incorporate state-action doctrine into §5, one would expect §5 to read more like §1983. That is, it might require preclearance "whenever a State or political subdivision *or any person acting under color of State law*" seeks to enact voting changes.[8] But §5 does not read like §1983.

---

[8] JUSTICE STEVENS argues that this example does not by its terms cover political parties. See *ante,* at 221–222, n. 34. The criticism is beside the point, however, because the example is not intended to demonstrate how Congress could have covered political parties as such; that, of course, could be easily achieved by inserting "political parties" in the opening clause of §5. Instead, the example is meant to emphasize that there is no textual basis for the conclusion that Congress imported the constitutional doctrine of state action into §5. Because there is no evidence that Congress did so, JUSTICE STEVENS, as well as JUSTICE BREYER, is wrong to use state-action doctrine as license to read "State" to mean "political party."

The Voting Rights Act does, in fact, contain precisely such language in a different section. "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello* v. *United States*, 464 U. S. 16, 23 (1983) (internal quotation marks omitted). Section 11(a) of the Act provides that "[n]o person *acting under color of law* shall fail or refuse to permit any person to vote who is entitled to vote under any provision of [the Voting Rights Act and supplemental provisions] or is otherwise qualified to vote, or willfully fail or refuse to tabulate, count, and report such person's vote." 42 U. S. C. § 1973i(a) (emphasis added). See also § 1973i(b) ("No person, whether *acting under color of law or otherwise,* shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote") (emphasis added). These provisions of the Act account for the very possibility that seems to motivate the Court's strained interpretation of § 5: that persons acting individually or as part of a group, as opposed to States or political subdivisions through their governmental bodies, will interfere with the right to vote.

I would not, therefore, accept the proposition that the constitutional doctrine of state action defines the breadth of the statutory term "State." Given the clarity of the word "State," together with the facts that Congress has traditionally encompassed the broad category of state action by using the phrase "under color of law," and has done so in other parts of this very Act, it is evident that Congress did not mean to incorporate state-action doctrine in § 5.

### 3

Even indulging the argument that § 5's coverage extends to all activity that qualifies as state action for constitutional purposes, the Court's further assumption that the actions of

the Party in this case are fairly attributable to the State is irreconcilable with our state-action precedents.[9]

JUSTICE STEVENS and JUSTICE BREYER are correct to suggest that, under the White Primary Cases—most notably *Smith* v. *Allwright,* 321 U. S. 649 (1944), and *Terry* v. *Adams,* 345 U. S. 461 (1953)—political parties may sometimes be characterized as state actors. Where they err, however, is in failing to recognize that the state-action principle of those cases "does not reach to all forms of private political activity." *Flagg Bros., Inc.* v. *Brooks,* 436 U. S. 149, 158 (1978). Rather, it "encompasses only state-regulated elections or elections conducted by organizations which in practice produce 'the uncontested choice of public officials.'" *Ibid.* (quoting *Terry, supra,* at 484 (Clark, J., concurring)). Thus, the White Primary Cases do not stand for the categorical rule that political parties are state actors, but only for the proposition that, in limited factual circumstances, a particular political party may be deemed an agent of the State.

This case is not governed by the state-action principle enunciated in either *Smith* or *Terry.* Unlike the primary in *Smith,* the Republican Party of Virginia's convention was not a "'state-regulated electio[n]'" to which the doctrine of state action extends. *Flagg Bros., Inc.* v. *Brooks, supra,* at 158. As an initial matter, it is important to recognize that *Smith* is on its face limited to primary elections. That is, *Smith* requires a sufficient degree of state regulation that "the party which is required to follow these legislative directions [is made] an agency of the State *in so far as it determines. the participants in a primary election.*" 321 U. S., at 663

---

[9] Although JUSTICE STEVENS and JUSTICE BREYER never expressly acknowledge their reliance on state-action theory, each finds it necessary to look to that case law for support. See *ante,* at 199–200, 210–219, 221; *ante,* at 235–237. Indeed, JUSTICE STEVENS' discussion of whether the Party acted under the Commonwealth of Virginia's authority in holding the convention is virtually indistinguishable from state-action analysis. See *ante,* at 194–200.

(emphasis added). In this case, the Party played no role in determining the participants in an election—whether primary, general, or special—but required persons who wished to attend its convention to pay a fee.

But, even assuming that the reasoning of *Smith* applies to conventions as well as actual elections, there is still insufficient state regulation in this case to find that "the party . . . [is] an agency of the State." *Ibid.* In *Smith,* the party was compelled by statute to hold a primary and was subject to myriad laws governing the primary from start to finish. See *id.,* at 653, n. 6, 662–663. By comparison, the amount and burden of the state regulation in this case pale. Appellants point to only two provisions of the Virginia Code that directly regulate nominating conventions. Section 24.2–510 imposes certain deadlines for the nomination of candidates by methods other than a primary. Va. Code. Ann. § 24.2–510 (1993). And once a candidate is selected, § 24.2–511 requires that the party chairman certify the candidate to the State Board of Elections. *Ibid.* While § 24.2–509 permits parties to choose their own method of nomination, it is a purely permissive, not a mandatory, provision; the party is not "required to follow [this] legislative directio[n]." *Smith* v. *Allwright,* 321 U. S., at 663. There exists no "statutory system for the selection of party nominees for inclusion on the general election ballot," *ibid.;* there are only a few relatively minor statutory requirements. In other words, when the party holds its convention to select a candidate, it is party, not state, machinery that is put in gear. Cf. *United States* v. *Classic,* 313 U. S. 299, 318 (1941).[10]

---

[10] While JUSTICE STEVENS believes that the decision in *Smith* did not depend at all upon state regulation of primaries, *ante,* at 199–200, and n. 17, *Smith* is by its terms premised upon the existence of a "statutory system." See *Smith* v. *Allwright,* 321 U. S. 649, 662–664 (1944) (detailing state law relating to primaries and concluding that the "statutory system" in Texas for the selection of party nominees "makes the party which is required to follow these legislative directions an agency of the State"). See also *Terry* v. *Adams,* 345 U. S. 461, 462 (1953) ("While no state law directed [the] exclusion [of blacks from the party's primary], our decision

Nor does coverage of the Party in this case "follo[w] directly from . . . *Terry.*" *Ante,* at 215 (opinion of STEVENS, J.). The three separate opinions that constituted the majority in that case contain little analysis of the state-action question, and there was certainly no theory of state action upon which the majority agreed. See *Flagg Bros., Inc.* v. *Brooks, supra,* at 158, and n. 6. Consequently, the holding in *Terry* has since been rationalized in light of two unique factual predicates: (1) a candidate selection system that foreordained the winner of the general election; and (2) the participation of the State in the intentional evasion of the Constitution for the purpose of discrimination. See *Edmonson* v. *Leesville Concrete Co.,* 500 U. S. 614, 625 (1991) ("The Jaybird candidate was certain to win the Democratic primary and the Democratic candidate was certain to win the general election"); *Mobile* v. *Bolden,* 446 U. S. 55, 64 (1980) (explaining *Terry* on grounds that "[t]he candidates chosen in the Jaybird primary . . . invariably won in the subsequent Democratic primary and in the general election" and that "there was agreement that the State was involved in the purposeful exclusion of Negroes from participation in the election process"). The nub of *Terry* was that the Jaybird primary was the *de facto* general election and that Texas consciously permitted it to serve as such; thus, the exclusion of blacks from that event violated the Fifteenth Amendment.

This case involves neither of the operative premises of *Terry.* First, there is no hint of state involvement in any purposeful evasion of the Constitution. No one—not the litigants, the Government, or the court below—has so much as suggested that the Party, in concert with the State, held a convention rather than a primary in order to avoid the constitutional ban on race-based discrimination. Nor has anyone implied that the Party had any intent to discriminate on the basis of race when it decided to charge a fee to cover

---

[in *Smith*] pointed out that many party activities were subject to considerable statutory control").

the costs of the convention.[11]   Second, it simply cannot be maintained that exclusion from the Party's 1994 convention was tantamount to exclusion from the general election.   The fact that the Party's 1994 nominee for the United States Senate *lost* the general election is proof enough that the modern-day Republican Party in Virginia does not have the stranglehold on the political process that the Democratic Party of Texas had in the 1940's.[12]   In short, this case is a far cry from *Terry*, and it does not fall within the bounds of state action delineated, albeit none too clearly, by *Terry*.[13]

In any event, subsequent decisions of this Court have "carefully defined" the scope of *Smith* and *Terry*.  *Flagg Bros., Inc. v. Brooks*, 436 U. S., at 158.   As we have refined

---

[11] It is true, as JUSTICE STEVENS states, that potential for discrimination is the prevailing test for preclearance under §5.   See *ante*, at 216–217, and n. 29.   But that is a different question from whether the Party's conduct rises to the level of state action under *Terry*, the issue I address here.

[12] JUSTICE STEVENS claims that, under *United States* v. *Classic*, 313 U. S. 299 (1941), "[v]oting at the nomination stage is protected regardless of whether it 'invariably, sometimes or never determines the ultimate choice of the representative.'"   *Ante*, at 218.   *Classic* did not so hold. Even assuming that *Classic* applies to conventions as well as primaries, that case merely stated, in dicta, that "where the primary is by law made an integral part of the election machinery," 313 U. S., at 318, the right to participate in a primary does not turn upon the dispositive nature of the primary.   Party nominating conventions in Virginia have not been merged by law with the election machinery of the State.   See *supra*, at 269 and this page.   Contrary to what JUSTICE STEVENS says, *ante*, at 218–219, n. 31, the petition procedure at issue in *Moore* v. *Ogilvie*, 394 U. S. 814 (1969), was by law made a part of the State's electoral system: It was expressly mandated by state statute.   See *id.*, at 815 (citing Ill. Rev. Stat., c. 46, §10–3 (1967)).

[13] In light of *Smith* and *Terry*, JUSTICE BREYER concludes that the word "State" does not "automatically place a party's all-white evasive maneuvers beyond [§5's] reach."   *Ante*, at 237 (emphasis deleted).   That, however, is not this case.   As discussed above, there is no basis in fact for inferring that the Party charged the fee as a strategy for producing an "'all-white' convention process" or as a method of evading the Constitution.   *Ibid.*   And the record in no way suggests that the three law students challenging the fee are black.

our state-action jurisprudence, the White Primary Cases have come to stand for a relatively limited principle. When political parties discharge functions "traditionally performed" by and "'exclusively reserved to'" government, their actions are fairly attributable to the State. *Ibid.* (quoting *Jackson* v. *Metropolitan Edison Co.*, 419 U. S. 345, 352 (1974)). See *Edmonson* v. *Leesville Concrete Co., supra,* at 621 (citing *Terry* as a case in which "the actor is performing a traditional governmental function"); *Lugar* v. *Edmondson Oil Co.*, 457 U. S., at 939 (citing *Terry* as illustration of "the 'public function' test"). In *Terry*, the Jaybirds performed the traditional and exclusive state function of conducting what was, in effect, the actual election.

In applying the public function test, "our holdings have made clear that the relevant question is not simply whether a private group is serving a 'public function.'" *Rendell-Baker* v. *Kohn*, 457 U. S. 830, 842 (1982) (citation omitted). Instead, "[w]e have held that the question is whether the function performed has been 'traditionally the *exclusive* prerogative of the State.'" *Ibid.* As JUSTICE O'CONNOR explained the White Primary Cases, "the government functions in these cases had one thing in common: exclusivity." *Edmonson* v. *Leesville Concrete Co.*, 500 U. S., at 640 (dissenting opinion). Thus, in order to constitute state action under the public function test, "private conduct must not only comprise something that the government traditionally does, but something that *only* the government traditionally does." *Ibid.*

The Party's selection of a candidate at the convention does not satisfy that test. As we stated in *Flagg Bros., Inc.* v. *Brooks*, "the Constitution protects private rights of association and advocacy with regard to the election of public officials" and it is only "the conduct of the elections themselves [that] is an exclusively public function." 436 U. S., at 158 (citing *Terry*). Thus, we have carefully distinguished the "conduct" of an election by the State from the exercise of

private political rights within that state-created framework. Providing an orderly and fair process for the selection of public officers is a classic exclusive state function. As the Constitution itself evidences, the organization of the electoral process has been carried out by States since the founding: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof." U. S. Const., Art. I, §4, cl. 1.

By contrast, convening the members of a political association in order to select the person who can best represent and advance the group's goals is not, and historically never has been, the province of the State—much less its exclusive province. The selection of a party candidate is not the type of function, such as eminent domain, that is "traditionally associated with sovereignty." *Jackson* v. *Metropolitan Edison Co., supra,* at 353. Cf. *San Francisco Arts & Athletics, Inc.* v. *United States Olympic Comm.,* 483 U. S. 522, 545 (1987) (holding that United States Olympic Committee is not a state actor because "[n]either the conduct nor the coordination of amateur sports has been a traditional governmental function"); *Blum* v. *Yaretsky,* 457 U. S. 991, 1011–1012 (1982) (holding that nursing home is not a state actor in part because provision of nursing home services is not a traditional and exclusive sovereign function); *Edmonson* v. *Leesville Concrete Co., supra,* at 638–641 (O'CONNOR, J., dissenting) (arguing that exercise of peremptory strikes by litigants in state court is not a government function but a matter of private choice). Though States often limit ballot access to persons who are official party nominees or who meet the requirements for independent candidates, see, *e. g., Storer* v. *Brown,* 415 U. S. 724 (1974), no State to my knowledge has ever held a convention in order to designate a political party's nominee for public office. Indeed, it would subvert the very purpose of democracy if the State possessed sole control over the identification of candidates for elective office.

I therefore fail to see how the selection of a party's candidate for United States Senator is a public electoral function. Cf. *ante*, at 194–195 (opinion of STEVENS, J.).[14]

In asking whether the Party acted under authority of the State in selecting its nominee at the convention, the Court emphasizes that Virginia automatically grants ballot access to the nominees of political parties, as defined by statute. See *ante*, at 195–198; *ante*, at 238 (BREYER, J., concurring in judgment). It does not follow from that fact, however, that "the Party exercised delegated state power when it certified its nominee for automatic placement on Virginia's general election ballot." *Ante*, at 195 (opinion of STEVENS, J.). The formulation of rules for deciding which individuals enjoy sufficient public support to warrant placement on the ballot, and the actual placement of those candidates on the ballot, are indeed part of the traditional power of the States to manage elections. See *Burdick* v. *Takushi*, 504 U. S. 428, 433 (1992). But *these* criteria are established exclusively and definitively by the State of Virginia—*not the Party*—in the Virginia Code. See Va. Code Ann. §§ 24.2–101, 24.2–511 (1993) (providing ballot access for certified nominees of organizations of Virginia citizens that receive, in either of the last two statewide general elections, at least 10 percent of the total votes cast). JUSTICE STEVENS is flatly wrong when he asserts that political parties in Virginia "are effectively granted the power to enact their own qualifications for placement of candidates on the ballot." *Ante*, at 197. Also, it is the Commonwealth of Virginia, not the Party itself, that has eliminated the Party's need to present a petition in support of its candidate. Cf. *ante*, at 197–198; Va. Code Ann. § 24.2–511(D) (1993) ("No further notice of candidacy or petition shall be

---

[14] Contrary to the representation of JUSTICE STEVENS, *ante*, at 194–195, the Party explicitly denies that it engaged in any public electoral function. See Brief for Appellees 30 ("The Virginia statutes cited by the law students do not show the exercise of public electoral functions . . . by the Party").

required of a candidate once the party chairman has certified his name to the State Board [of Elections]"). The Party has no control over the qualifications that determine "who may appear on the ballot." *Ante*, at 198.

What the Party does determine is something entirely distinct from the rules for ballot access, but which the Court fails to distinguish: the identity of the person who shall be entitled under state law, as the Party's nominee, to placement on the ballot by the State. In making that determination, the Party sets the "qualifications" necessary for the selection of its candidate. Though the Court conflates these two sets of criteria, the Party's standards for choosing its candidate are wholly separate from the State's standards for ballot access, as set forth in §§ 24.2–101 and 24.2–511 of the Virginia Code. When the Party picks a candidate according to its own partisan criteria, it does not act on behalf of the State. Whatever the reason the Party chooses its nominee, "it is not the government's reason." *Edmonson* v. *Leesville Concrete Co.*, 500 U. S., at 638 (O'CONNOR, J., dissenting). In sum, the selection of a party nominee "forms no part of the *government's* responsibility" in regulating an election. *Id.*, at 639.

To be sure, the Party takes advantage of favorable state law when it certifies its candidate for automatic placement on the ballot. See *ante*, at 195–197, and n. 13 (opinion of STEVENS, J.); *ante*, at 238 (BREYER, J., concurring in judgment). Nevertheless, according to our state-action cases, that is no basis for treating the Party as the State. The State's conferral of benefits upon an entity—even so great a benefit as monopoly status—is insufficient to convert the entity into a state actor. See *Jackson* v. *Metropolitan Edison*, 419 U. S., at 351–352.[15] If appellants believe that the State

---

[15] On JUSTICE STEVENS' and JUSTICE BREYER's view of the relationship between automatic ballot placement and state action, many private corporations in Virginia would qualify as state actors. Virginia corporations

has created an unfair electoral system by granting parties automatic access to the ballot, the proper course of action is to bring suit against the appropriate state official and challenge the ballot-access statute itself, see, *e. g.*, *Burdick* v. *Takushi, supra,* not to bring a preclearance suit against the Party and contest the registration fee. If the State sought to enact or administer a law limiting ballot access to only one group, as JUSTICE STEVENS repeatedly hypothesizes, see, *e. g., ante,* at 223, state action would most likely exist, and that law would be subject to § 5 and those provisions of the Constitution that impose restrictions on the States.

As for the point that Virginia allows the Party to choose its method of nomination, that fact does not warrant a finding of state action either. We have made it clear that an organization's "exercise of the choice allowed by state law where the initiative comes from it and not from the State, does not make its action in doing so 'state action.'" *Jackson* v. *Metropolitan Edison, supra,* at 357. Thus, when the Party exercised the choice afforded it by state law and opted to hold a convention, that decision did not amount to state action. The Party did not take the initiative to make that choice in order to serve the public interest; in reality, the selection of a nomination method is an intensely political matter, as recent

---

are, like most corporations, substantially advantaged by various provisions of state law. See, *e. g.*, Va. Code Ann. §§ 13.1–692.1, 13.1–870.1 (1993) (creating a limitation on liability for corporate officers and directors). I doubt seriously, however, that even the Members of today's majority would hold that when a corporation takes the necessary steps to invoke these statutory benefits, it thereby becomes a state actor; yet this is the logical result of the suggestion that the Party is a state actor because Virginia automatically places its nominee on the ballot. Such a conclusion would run headfirst into our case law, in which we have stated unequivocally that privately owned corporations, absent some symbiotic relationship with the State, are purely private actors. See *Jackson* v. *Metropolitan Edison,* 419 U. S., at 357–358; *Blum* v. *Yaretsky,* 457 U. S. 991, 1011 (1982).

intra-Party disputes over that choice well illustrate.[16]   Even if, as might be said here, "[t]he government erects the platform" upon which a private group acts, the government "does not thereby become responsible for all that occurs upon it."   *Edmonson* v. *Leesville Concrete Co., supra,* at 632 (O'CONNOR, J., dissenting).[17]

The basis for today's decision, which subjects a political party to the requirements of § 5, can only be state-action doctrine.   But treating the Party as an agent of the State in this case is not only wrong as a matter of statutory interpretation, it also squarely contravenes our state-action precedents.   In short, there is no legal justification—statutory, constitutional, or otherwise—for the conclusion that the Party is an entity governed by § 5.[18]

---

[16] See Editorial, Primarily Primaries, Richmond Times-Dispatch, Nov. 28, 1995, p. A–8 (describing contentious debate between supporters of the incumbent Virginia Senator and those of his Republican challenger over nomination methods and noting that "[i]t is only human for sides to favor the means—convention or primary—perceived to give their candidate an edge").

[17] With respect to Congress' power to prohibit discrimination in party affairs, see *ante,* at 223–224, it is enough for purposes of this case to note that it is well established that Congress may not regulate purely private behavior pursuant to its enforcement power under the Fourteenth and Fifteenth Amendments.   See *James* v. *Bowman,* 190 U. S. 127, 139 (1903) ("[A] statute which purports to punish purely individual action cannot be sustained as an appropriate exercise of the power conferred by the Fifteenth Amendment upon Congress to prevent action by the State through some one or more of its official representatives"); *Civil Rights Cases,* 109 U. S. 3 (1883).

[18] Indeed, JUSTICE BREYER's concurrence is founded on little more than sheer disbelief that Congress passed a statute that does not go as far in terms of coverage as he thinks, in light of the history of voting rights, the statute should.   See *ante,* at 236 ("How is it possible that a Congress, knowing this obvious history, would have wanted to enact a 'voting rights' law containing a major and obvious loophole . . .").   We are not free to construe statutes by wondering about what Congress "would have wanted to enact."   There are myriad reasons why measures that "a Congress"—I assume JUSTICE BREYER means a majority of the Members

## B

Assuming, *arguendo*, that the Republican Party of Virginia is a "State" within either the ordinary or the constitutional sense of the word, the question remains whether the Party has sought to administer a practice or procedure with respect to "voting." Based on the statutory definition of "voting," I conclude that the registration fee is not the type of election-related change with which the Act concerns itself.

Section 14 of the Act defines voting as "all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to . . . casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast with respect to candidates for public or party office." 42 U. S. C. § 1973*l*(c)(1). There is no mention of conventions. Because § 14 specifically enumerates the types of elections covered, but does not

of that institution—might "wan[t] to enact" never become law. We must look to the extant text of the statute and see what Congress has in fact, and not in theory, enacted.

In contrast to JUSTICE BREYER's imaginary statute, which covers all actors that might discriminate in the electoral process, § 5 is in reality limited to States and political subdivisions. Thus, the question in this case is not whether we should "read this Act as excluding all political party activity . . . [and] ope[n] a loophole in the statute," *ante*, at 235, but whether we should read § 5 to include such activity in the first place. If there is any "loophole" in § 5 here, it results from the fact that Congress simply did not cover political parties in the preclearance provision. JUSTICE BREYER's argument thus boils down to the curious notion that when Congress passes a statute that covers certain actors, it thereby establishes a "loophole" for all others. Moreover, while Congress was surely aware of the history of discrimination in the political process when it passed the Act, I presume it was also cognizant of the prohibitions of the First Amendment, see *infra*, at 282–285, as well as the constraints on its legislative powers under the Fifteenth Amendment, not the least of which is the state-action requirement. See n. 14, *supra*. Both of these *constitutional* limits on Congress' powers are sufficient reason to curb speculation and to think it "possible" (if the lack of textual evidence were not enough) that Congress did not intend to cover political parties under § 5.

include conventions, the most natural (and logical) inference is that Congress did not intend to include voting at conventions within the definition of "voting."

The omission of conventions from the list of elections covered in § 14 is especially revealing when compared to and contrasted with other federal election laws. The Federal Election Campaign Act of 1971 defines "election" to mean "(A) a general, special, primary, or runoff election; [and] (B) a *convention* or caucus of a political party which has authority to nominate a candidate." 86 Stat. 11, as amended, 2 U. S. C. § 431(1) (emphasis added). Similarly, § 600 of Title 18 criminalizes the promising of employment in exchange for political support "in connection with any general or special election to any political office, or in connection with any primary election or *political convention* or caucus held to select candidates for any political office." 18 U. S. C. § 600 (emphasis added). See also § 601(b)(2) (defining "election" as, *inter alia,* "a *convention* or caucus of a political party held to nominate a candidate") (emphasis added). Congress obviously knows how to cover nominating conventions when it wants to. After all, if there is a field in which Congress has expertise, it is elections.

JUSTICE STEVENS maintains that the fee relates to "voting" because, even though it was not imposed at one of the three types of elections listed in § 14, it diminished the effectiveness of appellants' votes at the general election. See *ante,* at 205–206. As I explained in *Holder* v. *Hall,* 512 U. S. 874 (1994), my view is that "as far as the Act is concerned, an 'effective' vote is merely one that has been cast and fairly counted." *Id.,* at 919 (THOMAS, J., concurring in judgment). Appellants do not contend that they were unable to submit a ballot in the general election or that their votes in that election were not properly registered and counted. I thus would not strain to hold, as do JUSTICES STEVENS and BREYER, that appellants' votes at the general election lacked

effect simply because their personal favorite for the Republican nomination was not on the ballot as the Party candidate.

JUSTICE STEVENS also reasons that party primaries and conventions are functionally indistinguishable. See *ante*, at 205–207, 214–215. Similarly, JUSTICE BREYER maintains that the convention in this case "resembles a primary about as closely as one could imagine." *Ante*, at 238. These assertions may or may not be true as a matter of practical judgment (or imagination). One crucial difference between primaries and conventions is that in the context of the former, the party often avails itself of a system erected, funded, and managed by the State, whereas in the latter, it generally does not. Consequently, charging the State with responsibility for voting changes that occur in a primary, where there may be actual state involvement, makes more sense than holding the State accountable for changes implemented at a party convention. Though JUSTICE BREYER lists several reasons why the Party's convention was like a primary, see *ibid.*, he fails to mention the critical factor of state involvement.

In any event, the question whether conventions ought to be governed by the Act is, at bottom, a matter of policy. And, as far as I can discern from the face of § 14, Congress made no policy determination in favor of regulating conventions under the Act. Though one might think it more sensible to include conventions in § 14, "[t]he short answer is that Congress did not write the statute that way." *United States* v. *Naftalin*, 441 U. S. 768, 773 (1979). When we examine the legislative lines that Congress has drawn, we generally do not hold Congress to exceedingly rigorous standards of logic. See, *e. g.*, *FCC* v. *Beach Communications, Inc.*, 508 U. S. 307, 314 (1993) (reviewing statute for rational basis under Equal Protection Clause and noting that " 'judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted' ") (quoting *Vance* v. *Bradley*, 440 U. S. 93, 97 (1979)); *International Primate Protec-*

*tion League* v. *Administrators of Tulane Ed. Fund,* 500 U. S. 72, 84–85 (1991) (enforcing, in statutory construction case, a distinction based on a "mere technicality" because "Congress could rationally have made such a distinction").

JUSTICE STEVENS is right that "we have held that § 5 applies to cases like *Whitley* v. *Williams,* which involve candidacy requirements and qualifications." *Presley* v. *Etowah County Comm'n,* 502 U. S., at 502; see *ante,* at 206–207. However, those cases all involved qualifications for candidates running in either primary or general elections that are clearly within the scope of § 14. See 502 U. S., at 502. ("In *Whitley* v. *Williams,* there were changes in the requirements for independent candidates running in general elections"). See also *NAACP* v. *Hampton County Election Comm'n,* 470 U. S. 166 (1985) (change in filing deadline to run for school board in general election); *Hadnott* v. *Amos,* 394 U. S. 358 (1969) (change in filing deadline for general election); *Dougherty County Bd. of Ed.* v. *White,* 439 U. S. 32 (1978) (rule requiring school board members to take unpaid leave of absence while campaigning for office, where plaintiff ran in primary and general election). The cases holding that changes in the composition of the electorate are covered by § 5 likewise involve general elections. See *Allen* v. *State Bd. of Elections,* 393 U. S., at 550, 569 (change from district to at-large, general election). Thus, we had no occasion in any of these cases to question whether activity that occurs at a nominating convention, as opposed to a primary, special, or general election, falls under the Act's definition of "voting." Rather, the issue in these cases was whether the contested change had a sufficiently "direct relation to, or impact on, voting," *Presley* v. *Etowah County Comm'n, supra,* at 506, so as to constitute a "practice or procedure with respect to voting" subject to preclearance under § 5. See, *e. g., Allen* v. *State Bd. of Elections, supra,* at 569 (holding that "the enactment in each of these cases constitutes a 'voting qualification or prerequisite to voting, or standard, practice,

or procedure with respect to voting' within the meaning of §5"). Regardless of whether Congress has ever "endorsed these broad constructions of §5," *ante*, at 205, they have no bearing on the meaning of §14.

Nor does the reference to the election of party officials bring the convention within the ambit of §14, as JUSTICE STEVENS and JUSTICE BREYER argue. See *ante*, at 207–208; *ante*, at 236–237. Section 14 does refer to "votes cast with respect to candidates for public or party office." 42 U. S. C. §1973*l*(c)(1) (1988 ed.). But JUSTICES STEVENS and BREYER amputate that phrase from the rest of the sentence, which provides that casting a vote at a "primary, special, or general election" for "candidates for . . . party office" constitutes "voting" for purposes of the Act. See *ibid.* (voting is "all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to . . . casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast with respect to candidates for public or party office"). Under §14, then, voting does extend to casting a ballot for a party officer, but only when that ballot is cast at a primary, special, or general election. Since this is obvious on the face of the statute, I see no need to resort to the legislative history of the Bingham Amendment. Cf. *ante*, at 208–209 (opinion of STEVENS, J.); *ante*, at 236–237 (BREYER, J., concurring in judgment). Though Representative Bingham may have had every intention of covering the activities of political parties under §5, there is no evidence that he succeeded in transforming that intention into law.

Finally, as JUSTICE STEVENS notes, §§2 and 5 would appear to be designed to work in tandem. See *ante*, at 209–210. Nonetheless, there is a patent discrepancy between the broad sweep of §2, which refers to "the political processes leading to nomination or election," and the undeniably narrower definition of voting set forth in §14, which is limited to the context of a "primary, special, or general election."

The incongruity appears to be a result of Congress' 1982 amendment of § 2 to expand its reach to pre-election political processes, see Pub. L. 97–205, § 3, 96 Stat. 134, without making any concomitant amendments to either § 5 or § 14. As long as § 5 contains the term "voting," and § 14 in turn defines that word, I think we must adhere to the specific definition provided in § 14. We cannot decline to apply that definition according to its terms simply because we think it would be preferable to harmonize §§ 2 and 5. If the 1982 amendment produced an undesirable inconsistency between §§ 2 and 5, Congress is free to harmonize them.[19]

## C

Were I otherwise willing to disregard the plain meaning of §§ 5 and 14, there is another factor counseling strongly against the Court's interpretation of the Act. Holding that the Party's convention fee must be precleared by the Government poses serious constitutional problems. Our stand-

---

[19] Legislative history is insufficient to bridge this gap in coverage that is apparent on the face of the statutes, as JUSTICE STEVENS would have it. See *ante*, at 210, n. 25. In any case, the legislative history cited by JUSTICE STEVENS is wholly nonresponsive to the issue of which types of entities must submit their rules for preclearance under § 5. That is, the legislative history discusses certain kinds of changes that must be precleared, without suggesting that the entities that must comply with the preclearance requirement are anything other than States and political subdivisions. The part of the Senate Report cited by JUSTICE STEVENS addresses the need to preclear statewide redistricting plans. Reapportionment plans, of course, are usually enacted by state or local legislative bodies. See, *e. g., Beer* v. *United States*, 425 U. S. 130 (1976) (reapportionment plan adopted by city council). The passage in the House Report states that a voting practice that is outside the scope of the preclearance provision (either because it was in existence before 1965 or is implemented in a noncovered jurisdiction) may nonetheless be challenged in a lawsuit under § 2; hence the distinction between preclearance and litigation. The Report thus supports precisely the opposite proposition for which JUSTICE STEVENS cites it: It expressly states that not every action that can be brought under § 2 falls within the scope of § 5.

ard practice is to avoid constructions of a statute that create such difficulties. See *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Constr. Trades Council*, 485 U. S. 568, 575 (1988). "This approach not only reflects the prudential concern that constitutional issues not be needlessly confronted, but also recognizes that Congress, like this Court, is bound by and swears an oath to uphold the Constitution. The courts will therefore not lightly assume that Congress intended to infringe constitutionally protected liberties." *Ibid.*

Among the constitutional questions raised by this decision are ones relating to freedom of political association. "The First Amendment protects political association as well as political expression." *Buckley* v. *Valeo*, 424 U. S. 1, 15 (1976). Political parties, and their supporters, enjoy this constitutional right of political affiliation. *Cousins* v. *Wigoda*, 419 U. S. 477, 487 (1975). "[A]t the very heart of the freedom of assembly and association," is "[t]he right of members of a political party to gather in a . . . political convention in order to formulate proposed programs and nominate candidates for political office." *Id.*, at 491 (REHNQUIST, J., concurring in result). A convention to nominate a party candidate is perhaps the classic forum for individual expression of political views and for association with like-minded persons for the purpose of advancing those views.

We need not look beyond this case to "hypothetical," *ante*, at 228, controversies in order to identify substantial First Amendment concerns. As applied today, § 5 burdens the rights of the Party and its members to freedom of political association. The Party has represented in this Court that it decided to charge each delegate a registration fee rather than to fund the convention with contributions from a few major donors in order to avoid undue influence from a small group of contributors. See Brief for Appellees 45–46. Under our precedents, the Party's choice of how to fund its statewide convention seems to be a constitutionally pro-

tected one. "The Party's determination of the boundaries of its own association, and of the structure which best allows it to pursue its political goals, is protected by the Constitution." *Tashjian* v. *Republican Party of Conn.*, 479 U. S. 208, 224 (1986). See also *Democratic Party of United States* v. *Wisconsin ex rel. La Follette*, 450 U. S. 107, 124 (1981) ("A political party's choice among the various ways of determining the makeup of a State's delegation to the party's national convention is protected by the Constitution"). As the Court of Appeals for the District of Columbia Circuit has explained, "a party's choice, as among various ways of governing itself, of the one which seems best calculated to strengthen the party and advance its interests, deserves the protection of the Constitution . . . . [T]here must be a right not only to form political associations but to organize and direct them in the way that will make them most effective." *Ripon Society, Inc.* v. *National Republican Party*, 525 F. 2d 567, 585 (1975) (en banc), cert. denied, 424 U. S. 933 (1976) (emphasis deleted). By requiring the Party to seek approval from the Federal Government before it may implement rules regarding the funding of nominating conventions, the Court has burdened the Party's ability to institute the constitutionally protected choice embodied in those rules.

Moreover, if the Attorney General or a federal court were to refuse to preclear the registration fee, the Government would in effect be requiring the Party to include persons who could not, or would not, pay the registration fee for its convention. But, as we have held, "the freedom to associate for the 'common advancement of political beliefs,' necessarily presupposes the freedom to identify the people who constitute the association, and to limit the association to those people only." *Democratic Party of United States* v. *Wisconsin, supra*, at 122 (citation omitted). See also *Eu* v. *San Francisco County Democratic Central Comm.*, 489 U. S. 214, 224 (1989). Section 5, under the Court's novel construction, impinges upon that interest. Furthermore, the Court creates

a classic prior restraint on political expression, as JUSTICE SCALIA cogently explains. See *ante*, at 243–246.

Legislative burdens on associational rights are subject to scrutiny under the First Amendment. See *Burdick* v. *Takushi*, 504 U. S., at 433–434 (level of scrutiny depends upon severity of the infringement); cf. *Eu*, *supra*, at 225; *Cousins*, *supra*, at 489. Severe interference with protected rights of political association "may [only] be sustained if the [government] demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms." *Buckley*, *supra*, at 25. Though JUSTICE STEVENS and JUSTICE BREYER glibly dismiss this constitutional inquiry, see *ante*, at 228–229; *ante*, at 239 ("[s]uch questions, we are satisfied, are not so difficult"), it is not equally obvious to me that § 5, as interpreted today, would survive a First Amendment challenge.

JUSTICE STEVENS is correct that, under the White Primary Cases, First Amendment rights of political association cede to the guarantees of the Fifteenth Amendment in certain circumstances. *Ante*, at 228. The Court has held that when state-approved exclusion from a political group is tantamount to exclusion from the actual election, that exclusion violates the Fifteenth Amendment. See *Terry* v. *Adams*, 345 U. S., at 469–470. However, where a person is refused membership in a political organization without any involvement on the part of the State, and membership in the group is not a precondition to participation in the ultimate choice of representatives, there can logically be no state denial of the right to vote. In such a situation, there is no conflict between the First and Fifteenth Amendments.

Exclusion of political parties from the coverage of § 5 obviates the foregoing First Amendment problems. Cf. *Miller* v. *Johnson*, 515 U. S. 900, 926–927 (1995) (rejecting possible reading of § 5 because it raised constitutional problems). By letting stand a construction of § 5 that encompasses political parties, however, the Court begets these weighty First

Amendment issues. Ironically, the Court generates these difficulties by contorting, rather than giving the most natural meaning to, the text of § 5.

## II

I also disagree with the Court that § 10 of the Voting Rights Act contains an implicit cause of action for private suits against States and localities that impose poll taxes upon voters. Section 10 states:

> "[T]he Attorney General is authorized and directed to institute forthwith in the name of the United States such actions, including actions against States or political subdivisions, for declaratory judgment or injunctive relief against the enforcement of any requirement of the payment of a poll tax as a precondition to voting, or substitute therefor enacted after November 1, 1964, as will be necessary to implement the declaration of subsection (a) of this section and the purposes of this section." 42 U. S. C. § 1973h(b).

By its very terms, § 10 authorizes a single person to sue for relief from poll taxes: the Attorney General. The inescapable inference from this express grant of litigating authority to the Attorney General is that no other person may bring an action under § 10. Though JUSTICE STEVENS contends that implication of a private cause of action is crucial to the enforcement of voting rights, *ante*, at 231, § 10 itself indicates otherwise. Suits instituted by the Attorney General were evidently all that Congress thought "necessary to implement . . . the purposes of this section." *Ibid.* Section 10 explicitly entrusts to the Attorney General, and to the Attorney General alone, the duty to seek relief from poll taxes under the Act.

Although *Allen* v. *State Bd. of Elections*, 393 U. S. 544 (1969), held that § 5 of the Voting Rights Act contains a private right of action, *Allen* does not require the same result under § 10. Section 5 affirmatively proclaims that " 'no per-

son shall be denied the right to vote for failure to comply with [a new state enactment covered by, but not approved under, §5].'" *Id.*, at 555. It was "[a]nalysis of this language" that "indicate[d] that appellants may seek a declaratory judgment that a new state enactment is governed by §5." *Ibid.* A private cause of action was thought necessary to effectuate "[t]he guarantee of §5 that no person shall be denied the right to vote for failure to comply with an unapproved new enactment subject to §5." *Id.*, at 557.[20] See also *Cannon* v. *University of Chicago*, 441 U. S. 677, 690 (1979) ("[I]t was statutory language describing the special class to be benefited by §5 . . . that persuaded the Court that private parties within that class were implicitly authorized to seek a declaratory judgment against a covered State").

Unlike §5, §10 creates no statutory privilege in any particular class of persons to be free of poll taxes. The only possible "guarantee" created by §10 is that the Attorney General will challenge the enforcement of poll taxes on behalf of those voters who reside in poll tax jurisdictions. What §10 does not do, however, is actually prohibit a State or political subdivision from administering poll taxes. Nor does it declare that no person shall be required to pay a poll tax. Rather, §10 merely provides, as a "declaration of policy" prefacing the authorization for civil suits, that "the constitutional right of citizens to vote is denied or abridged in some areas by the requirement of the payment of a poll tax as a precondition to voting." 42 U. S. C. §1973h(a). It further provides that when a jurisdiction administers a poll tax, the Attorney General may prevent its enforcement by bringing suit in accordance with certain procedural requirements, including a three-judge district court and direct appeal to this Court. See §1973h(c). Section 10 creates no ban on the imposition of poll taxes, whereas §5, *Allen* said,

---

[20] This language makes clear that the "guarantee" described in *Allen* was not, as JUSTICE STEVENS asserts, "simply its holding that individuals can sue under §5." *Ante*, at 233, n. 43.

guaranteed that no person would be subject to unapproved voting changes. Thus, § 10 confers no rights upon individuals and its remedial scheme is limited to suits by the Attorney General. Cf. *ante,* at 232 (opinion of STEVENS, J.).

I am unpersuaded by the maxim that Congress is presumed to legislate against the backdrop of our "implied cause of action" jurisprudence. See *Cannon* v. *University of Chicago, supra,* at 698–699; *ante,* at 230–231. That maxim is relevant to but one of the three factors that were established for determining the existence of private rights of action in *Cort* v. *Ash,* 422 U. S. 66 (1975), and that were applied in *Cannon.* See *Cannon* v. *University of Chicago, supra,* at 699 (considering "contemporary legal context" of statute to assess the third *Cort* factor, whether the legislative history reveals an intent to create a cause of action). Though we may thus look to this presumption for guidance in evaluating the history of a statute's enactment, "what must ultimately be determined is whether Congress intended to create the private remedy asserted." *Transamerica Mortgage Advisors, Inc.* v. *Lewis,* 444 U. S. 11, 15–16 (1979). See also *Touche Ross & Co.* v. *Redington,* 442 U. S. 560, 575 (1979). We do this by "begin[ning] with the language of the statute itself." *Transamerica Mortgage Advisors, Inc.* v. *Lewis, supra,* at 16. In my view, § 10—which authorizes only the Attorney General to sue for relief and creates no enforceable right in any person to be free from poll taxes—precludes the inference that Congress intended the availability of implied causes of action under that section.[21]

Finally, the 1975 amendments to the Voting Rights Act do not justify the judicial creation of a private cause of action

---

[21] Nor do I think that we should imply a cause of action under § 10 simply because we have heard and decided challenges by private plaintiffs under § 2. See *ante,* at 232 (opinion of STEVENS, J.); *ante,* at 240 (BREYER, J., concurring in judgment). We ought not base our decision in this case on the fact that we have inadvertently, and perhaps incorrectly, allowed private suits to proceed under other sections of the Act.

under § 10.   See *ante*, at 233–234 (opinion of STEVENS, J.). Section 3 is a generalized section of the Act, providing three-judge district courts with special authority in adjudicating Voting Rights Act claims.   See 42 U. S. C. § 1973a. As appellants accurately state, § 3 "explicitly recognizes that private individuals can sue under the [Act]."   Brief for Appellants 41.   Section 3 does not, however, identify any of the provisions under which private plaintiffs may sue.   The most logical deduction from the inclusion of "aggrieved person" in § 1973a is that Congress meant to address those cases brought pursuant to the private right of action that this Court had recognized as of 1975, *i. e.*, suits under § 5, as well as any rights of action that we might recognize in the future. Section 14(e), which provides for attorney's fees to "the prevailing party, other than the United States," is likewise a general reference to private rights of action.   Like § 3, § 14(e) fails to address the availability of a private right to sue under § 10.   § 1973*l*(e).[22]

At bottom, appellants complain that unless a private cause of action exists under § 10, private plaintiffs will be forced to challenge poll taxes by bringing constitutional claims in single-judge district courts.   This, they contend, "is directly contrary to the special procedures for adjudicating poll tax claims established by Congress in section 10."   Brief for Appellants 38.   It is appellants' claim, however, that flatly contravenes § 10.   The only "special procedure" for litigating poll tax challenges that Congress created in § 10 is an action by the Attorney General on behalf of the United States.

---

[22] It does not follow from Congress' technical amendment of § 10 in 1975, which JUSTICE BREYER takes as an indication that "§ 10 remained an important civil rights provision," *ante*, at 240, that we should imply a cause of action thereunder.   A statute outlawing a class of voting practices and authorizing the Attorney General of the United States to sue jurisdictions that engage in such practices is surely an "important" provision, even if not privately enforceable.

*   *   *

To conclude, I would decide this controversy on the ground that the Republican Party of Virginia is not a "State or political subdivision" for purposes of § 5. This is true whether one invokes the ordinary meaning of the term "State" or even, as the Court erroneously does, the state-action theory of our constitutional precedents. Even if the Party were a "State" or a state actor, the registration fee does not relate to "voting," as defined by § 14. Because the argument for the applicability of § 5 in this case fails at each step, I would not require the Party to preclear its convention registration fee under § 5. Nor would I imply a private right of action under § 10.

Today, the Court cuts § 5 loose from its explicit textual moorings regarding both the types of entities and the kinds of changes that it governs. JUSTICE BREYER, writing for three Members of the Court, does so without attempting to define the limits of § 5's applicability to political parties and their practices. See *ante,* at 238 ("We need not . . . determin[e] when party activities are, in effect, substitutes for state nominating primaries"); *ibid.* ("Nor need we go further to decide just which party nominating convention practices fall within the scope of the Act"). Indeed, JUSTICE BREYER expends much ink evading inevitable questions about the Court's decision. See *ante,* at 239 ("We go no further in this case because, as the dissents indicate, First Amendment questions about the extent to which the Federal Government, through preclearance procedures, can regulate the workings of a political party convention, are difficult ones, as are those about the limits imposed by the state-action cases") (citations omitted). This is not reassuring, and it will not do. Eventually, the Court will be forced to come to grips with the untenable and constitutionally flawed interpretation of § 5 that it has wrought in this case. That encounter,

which could easily have been averted today, will involve yet another Voting Rights Act conundrum of our own making.[23]

When leveled against wholly private partisan organizations with respect to their internal affairs, §5's potential for use as an instrument of political harassment should be obvious to all. I have no doubt that §5 was never intended for such purposes. Rather, that section was aimed at preventing covered States from intentionally and systematically evading the guarantees of the Voting Rights Act by simply recasting their election laws. This suit, along with the ones certain to follow, trivializes that goal. I respectfully dissent.

---

[23] Apart from the preclearance issues that the Court leaves unresolved, today's judgment raises additional questions under the Voting Rights Act, since the phrase "State or political subdivision" is used in several other key provisions. For instance, may political parties bring a declaratory judgment action under §5 as an alternative to preclearance? See 42 U. S. C. §1973c. May political parties bring a "bailout suit" for exclusion from the category of covered jurisdictions? See §1973b(a). Are political parties subject to suit under §2? See §1973(a). Can a three-judge district court authorize the appointment of federal examiners to monitor a political party's activities during the pendency of, and as part of a final judgment in, a voting rights suit? See §1973a(a). Quite apparently, the Court has not stopped to consider the ramifications of its decision.